507 So.2d 77 (1987)
Judy K. BARBEE
v.
Bernie O. PIGOTT and Lucille Pigott.
No. 55959.
Supreme Court of Mississippi.
April 15, 1987.
Rehearing Denied May 20, 1987.
*78 Floyd J. Logan, Hopkins, Logan, Vaughn & Anderson, Gulfport, for appellant.
Lonnie Smith, Williams, Smith & Stockstill, Picayune, E.B. Williams, Jr., Lampton O. Williams, Joe H. Montgomery, Williams, Williams & Montgomery, Poplarville, for appellee.
Before HAWKINS, P.J., and DAN M. LEE and ROBERTSON, JJ.
HAWKINS, Presiding Justice, for the Court:
Judy K. Barbee appeals from a decree of the chancery court of Pearl River County dismissing her complaint as a tort judgment creditor to set aside as fraudulent a conveyance from Bernie O. Pigott to his estranged wife Lucille Pigott in satisfaction of antecedent claims and debts she had, as well as to furnish him bail money and pay his attorney on a murder charge in Louisiana.
*79 Finding substantial evidence in the record from which the chancellor could find adequate consideration for the conveyance, and that he was not manifestly wrong, we affirm.

FACTS
Lucille and Bernie Pigott were in their mid-thirties when they married in Louisiana in 1958. Lucille was the owner of a bar and lounge and Bernie had neither money nor property. After their marriage they formed B & L Construction Company in Bunkie, Louisiana, with Lucille providing all of the capital necessary to start the business. In 1960, Lucille separated from Bernie and moved to Mississippi because he was mistreating their adopted son.
For clarity we have attached an appendix denoting the five tracts of the subject property. In Mississippi, Lucille moved on 80 acres, the Southwest Quarter of Northwest Quarter (SW 1/4 NW 1/4) and the Northwest Quarter of Southwest Quarter (NW 1/4 SW 1/4), Section 21, Township 6 South, Range 16 West in Pearl River County (Tract V). Lucille testified that she had paid $4,000 for this property that she and Bernie purchased as joint tenants in 1958. On June 17, 1960, a 36-acre tract, the Southwest Quarter of the Southeast Quarter (SW 1/4 of SE 1/4), Section 20, Township 6 South, Range 16 West, less four acres in Pearl River County (Tract II) was acquired in Bernie's name alone by a property exchange. On June 18, 1960, a 97.26-acre tract was purchased in Bernie's name only. This last tract comprised 40 acres in Pearl River County, Southeast Quarter of Southeast Quarter (SE 1/4 SE 1/4), Section 20, Township 6 South, Range 16 West (Tract IV) and 57.26 acres in Hancock County. This Hancock County property comprised 40 acres in the Northwest Quarter of Northeast Quarter (NW 1/4 NE 1/4), Section 29, Township 6 South, Range 16 West, and a 17.26-acre parcel located in the Northeast Quarter of Northeast Quarter (NE 1/4 NE 1/4, Section 29, Township 6 South, Range 16 West. Lucille testified that she paid $13,000 to $14,000 of her own money and Bernie paid nothing for the property.
On June 26, 1962, an .8-acre parcel in Pearl River County, located in the Northwest corner of the Southwest Quarter of Southwest Quarter (SW 1/4 SW 1/4), Section 21, Township 6 South, Range 16 West (Tract III), was acquired by Bernie and Lucille as joint tenants as a result of a like exchange of property from Tract IV above. As a result, Tract IV was diminished to 39.2 acres. In 1963 Lucille began construction of a home on this 39.2-acre parcel, on which she spent $44,000.
On February 8, 1965, Tracts II and IV, along the 57.26 acreage in Hancock County, were reconveyed to Bernie and Lucille as joint tenants with rights of survivorship. On January 27, 1966, Bernie and Lucille acquired 40 acres in Pearl River County, the Southeast Quarter of Northwest Quarter (SE 1/4 NW 1/4), Section 21, Township 6 South, Range 16 West (Tract I) as joint tenants. Lucille testified she paid $13,000 of her own money and that Bernie paid nothing.
Therefore all of the properties mentioned above (Tracts I  V) were owned by Bernie and Lucille as joint tenants as of 1966. These properties were bisected by the county road. Tracts I, III and V were on the northeast side of the road, and Tract II was on the southwest side of the road. The 39.2-acre parcel of Tract IV consisted of 22.74 acres on the northeast side of the road and 16.46 acres directly opposite on the southwest side. The 57.26 Hancock County acreage was also on the southwest side of the road.
After the Pigotts separated, their marital relationship was not one of a loving, devoted couple. During the '60s Bernie first came to see the children in Mississippi once every two weeks. These visits became sporadic, and eventually Bernie would not visit at all unless there was some special reason. During this time Bernie resided in Bunkie, with his "built-in secretary." B & L Construction Company went out of business sometime in 1969.
Lucille testified that during the early '70s Bernie continually came to her and demanded money to put into the construction business. As a result of these demands, *80 he received $40,000 of the family savings and $21,000 from Lucille's sale of cattle.
In the 1970s Bernie started driving an eighteen-wheel truck and in 1976 he met the appellant Barbee, then 22-years-old, who was also a truck driver. Bernie increasingly made monetary demands from Lucille, always promising repayment. A deed of trust was executed by Bernie and Lucille to the First National Bank of Picayune on April 29, 1976, securing a loan of $44,115.00. Lucille testified that she received $5,000 for use in her egg business and the remainder went to Bernie. In addition to taking Lucille's farm income between 1976 and 1979, there were other loans with First National Bank of Picayune in the amounts of $5,342.42 on December 12, 1978, and $10,112.75 on July 3, 1979. Bernie received all of the proceeds of these loans, accompanied by the usual threats and promises of repayment. Lucille recalled the scenario of the 1979 loan:
I know this one well because he come threatening the same thing all over and over. The only way you could appease Bernie was to do what he wanted; otherwise, you didn't have no peace. I went to the bank and Grady did this for me. He let me have $10,000. I got the check and handed it to Bernie. Bernie wouldn't even shake hands with him. He walked over and cashed the check and walked out the front door.
Bernie also testified that Lucille supported him from 1969 to 1979, giving him money so he could have a "[expletive] good time with women." Barbee testified that she received a 1978 Thunderbird from Bernie as a birthday present, and he also permitted her to incur a $5,000 bill at Sears.
Grady Thigpen, president of the First National Bank of Picayune, testified that the money from the loans was given to Bernie, but Lucille made all the payments. He further testified that Lucille was under constant pressure and deeply worried about her debts, that she could not depend on Bernie for any help and was afraid of him. Thigpen also recalled Bernie's threats to Lucille.
Sometime in early 1979, Bernie rented a house in Alexandria, Louisiana, which was occupied by himself, Barbee, Pat Morrison (Barbee's live-in friend), and Barbee's five children. Both Barbee and Bernie testified that Bernie paid for the rent, utilities, food and clothing for Barbee and her children.
On March 3, 1979 Lucille filed for divorce against Bernie on the grounds of habitual cruel and inhuman treatment and adultery in the chancery court of Pearl River County. Lucille testified that the final decree was delayed because of Bernie's exorbitant demands for his half of the property. Lucille testified that:
Well, every time it would get time for it to come up to go before the judge, he threatened me. He'd say that if he didn't get a huge amount  if this thing went to court and he didn't get a huge amount of money out of the farm and everything else, that he would kill the lawyers, the judge, me and the sheriff, if that's what it took.
On October 13, 1979, Bernie came to Mississippi in another attempt to obtain money from Lucille. He pointed a shotgun at her and threatened to "blow her guts out" if she did not give him any money. When she was unable to get any money, Bernie went to Slidell and told one of her friends that Lucille would stand good for $2,000, and Lucille's friend wrote Bernie out a check.
After receiving the money, Bernie went back to Bunkie and found Barbee was out on a date with another man. After Barbee returned to the house, an argument ensued between Bernie, Barbee and Morrison. The altercation culminated in two shotgun blasts by Bernie, killing Morrison and wounding Barbee. Bernie was charged with murder and attempted murder and incarcerated in Rapides Parish Jail under $100,000 bond. About 1:00 a.m., on the night of his arrest, Bernie called Lucille from the jail and told her to come to Louisiana, get his belongings and his children's horses, and take them to Mississippi. Bernie testified that he did this to keep someone from stealing them.
*81 Lucille went to see Bernie in jail, where he told her that he needed help and nobody in the world would help him. Lucille first refused, but testified Bernie "cried and carried on, and so I told him, I said, `The only way I'll help you is if the land is put in my name like it should have been done years ago.' And I said, `Then I will hire your lawyer.'" Lucille also testified that it had always been understood that the Mississippi farm was hers, even though the papers recognized Bernie as a joint tenant. Both Lucille and Bernie testified that they had a joint tenancy because if something happened to either of them, the children would be taken care of without the estate being tied up in probate. Lucille testified that Bernie had always promised to fix the papers for her and the children, but changed his mind due to the persuasions of his other women.
On October 18, 1979, Bernie executed a warranty deed for 196 acres (Tracts I-V) to Lucille. This deed was filed for record on October 23, 1979.[1]
As promised, Lucille expended $7,500 in posting bond for Bernie and later paid attorney's fees of $10,000.
On January 25, 1980, Barbee sued Bernie in tort in Louisiana seeking damages for her injuries.
On February 9, 1980, the chancery court for Pearl River County granted a divorce to Lucille from Bernie on the grounds of habitual cruel and inhuman treatment.
On July 29, 1980, the Rapides Parish District Court entered a judgment in favor of Barbee in her suit against Bernie for the sum of $200,000 damages plus interest.
On August 1, 1980, Lucille sold 179.5 acres of her property to Gregory and Anna Mitchell for $200,000. This property, consisted of all tracts on the southwest side of the county road and was composed of the following parcels of land: 52.46 acres in Pearl River County (Tract II and 16.46 acres of Tract IV), 57.26 acres in Hancock County, and approximately 70 additional acres of abutting Hancock County property. See Appendix. This 179.5 acres was conveyed by two warranty deeds, one conveying the 52.46 acres of Pearl River County property and the other conveying the remaining 127 acres of Hancock County property.[2] After Lucille sold 179.5 acres to *82 the Mitchells, she was left with 143.54 acres of Pearl River County land, all located on the northeast side of the county road (Tracts I, III, 22.74 acres of Tract IV and Tract V).
After Barbee's judgment was affirmed by a Louisiana appellate court in 1981, she filed the action herein, seeking to have the Louisiana judgment recognized and enrolled and seeking to have the conveyance of October 18, 1979, set aside. Further, Barbee sought to impress a lien on Tracts I-V and have the lien foreclosed. Bernie answered disclaiming any interest in the land, and claiming there was adequate consideration for the conveyance to Lucille. Bernie has since been sentenced to Angola State Penitentiary where he remains incarcerated today.
The primary issue at trial was whether or not Lucille had given adequate consideration in exchange for Bernie's one-half interest in the 196 acres of Pearl River County property.
Bernie's interest was established by Fred Lewis, a real estate appraiser who found the market value of the Pigott property to be $525,000. From this figure Bernie's one-half interest was determined to be $262,500. Although the October 18 conveyance from Bernie to Lucille conveyed 196 acres of Pearl River County property, Lewis's appraisal inexplicably included 127 acres of Hancock County property in computing the market value. In other words, Lewis computed Bernie's interest in 323 acres instead of 196 acres.
On direct examination, Lewis testified as follows:
BY MR. LOGAN:
Q. Mr. Lewis, at my request, have you had occasion to conduct an inspection/examination and prepare an appraisal of the property listed in the *83 Bill of Complaint as Tracts I through V, which I now show you?
A. Yes, sir.
Q. Would you describe the nature of that property for the Court, please?
A. This property contains about 323 acres. It fronts on two sides of  its in the Flattop community, and it fronts on both sides of the county road. It has ... 179 acres on the one side, and the remaining acreage of the 323 acres is on the other side. [Emphasis added]
Vol. IV, p. 310.
Purusant to his appraisal, Lewis prepared a sketch of "Tracts I-V." This sketch shows the entire 179 acres Southwest of the county road was considered as one tract. This "tract" contains 127 acres of Hancock County property that is irrelevant to the determination of Bernie's interest in the 196 acres of Pearl River County property.
On cross-examination, Lewis's error was made even more apparent:
Q. I believe you gave, if I understood you right  what was your appraisal of all the property of the five tracts  as Mr. Logan referred to, the five tracts?
A. If you are referring to the 323 acres, more or less  is that what you are referring to, sir?

Q. Yes.
A. I reflect a market value of $525,000 as of October 18, 1979. [Emphasis added]
Vol. IV, p. 335
On October 6, 1983, the chancellor found that: "... over the years Lucille more than adequately compensated Bernie for his interest in the property. The record is replete with such testimony from Bernie, Lucille and bank president, Thigpen." Since a fair consideration was paid, the chancellor found the conveyance was not per se fraudulent. The chancellor, after weighing the evidence, found Barbee failed to meet her burden of proving an intention to defraud creditors on the part of the Pigotts. Therefore, the lower court held the conveyance would not be set aside and the lien not impressed.
Subsequently, Barbee filed this appeal.

LAW

I.

DID THE CONVEYANCE VIOLATE MISS. CODE ANN. § 93-3-9?
Barbee argues first that the conveyance violates Miss. Code Ann. § 93-3-9, citing Morgan v. Sauls, 413 So.2d 370 (Miss. 1982); Hudson v. Allen, 313 So.2d 401 (Miss. 1975); Dogan v. Cooley, 184 Miss. 106, 185 So. 783 (1939); McCrory v. Donald, 119 Miss. 256, 80 So. 643 (1919); and Gregory, Stagg & Co. v. Dodds, 60 Miss. 549, 552-553 (1882).
This statute applies to voluntary conveyances, i.e., conveyances without consideration. Morgan v. Sauls, supra; Hudson v. Allen, supra; Burks v. Moody, 141 Miss. 370, 106 So. 528 (Miss. 1926); McCrory v. Donald, supra.
It is clear from this record that the deed was not a voluntary conveyance, in which consideration was nonexistent and therefore this contention of Barbee has no merit.

II.

WAS THE DEED SUPPORTED BY ADEQUATE CONSIDERATION?
The law condemning conveyances to defraud creditors has a long history, beginning in England,[3] and most states in this country from their inception have enacted statutes to set aside such transactions, based upon the original English proscription. Thus, in Sexton v. Wheaton, 21 U.S. (8 Wheat) 229, 5 L.Ed. 603 (1823), Chief Justice Marshall stated:
It would seem to be a consequence of that absolute power which a man possesses over his own property, that he may make any disposition of it which does not interfere with the existing *84 rights of others, and such disposition, if it be fair and real, will be valid. The limitations on this power are those only which are prescribed by law.
And, in Drury v. Cross, 74 U.S. (7 Wall.) 299, 19 L.Ed. 40 (1869), the Supreme Court stated: "In other words, the law condemns any plan in the disposition of property which necessarily accomplishes a fraudulent result."
This Court in Trimble v. Turner, 13 Smedes & Marshall 348, 362 (Miss. 1850), held:
The law requires a man to devote the whole of his property, with some trivial exceptions, fairly to the payment of his debts. It will not tolerate any subterfuge or device, which is intended to divert it from that purpose.
See also: Bullitt v. Taylor, 34 Miss. 708 (1858); Gary v. Jacobson, 55 Miss. 204 (1877). In 1848 this State enacted a statute virtually identical with the English statute 13 Eliz., ch. 5, which has since been recodified as Miss. Code Ann. § 15-3-3. Many states have also adopted the Uniform Fraudulent Conveyance Act (1918) (UFCA), which in general is declaratory of the rules of common law interpreting the English statute.
These statutes invalidating fraudulent conveyances are designed to prevent debtors from putting their property which is available for the payment of their debts beyond the reach of creditors. Kummet v. Thielen, 210 Minn. 302, 298 N.W. 245 (1941).
Clearly Barbee, as a tort claimant against Bernie, was one of the kinds of creditors designed to be protected by this law. Morgan v. Sauls, supra. The question then is whether the deed violates the statute.
This Court takes a dim view of attempting to circumvent creditors by deceitful means, as was set forth in the seminal case of Blount v. Blount, 231 Miss. 398, 95 So.2d 545 (1957); see also: Cobb v. Cobb, 485 So.2d 691 (Miss. 1986); Morgan v. Sauls, 413 So.2d 370 (Miss. 1982); Allred v. Nesmith, 245 Miss. 376, 149 So.2d 29 (1963).
The crux of this case, therefore, is whether the conveyance violated Miss. Code Ann. §§ 15-3-3 and 15-3-5, which state in pertinent part:
§ 15-3-3. Fraudulent conveyances, judgments, loans and the like.
Every ... conveyance of lands, ... by writing .. . had or made and contrived of ... fraud, covin, collusion, or guile, to the intent or purpose to delay, hinder, or defraud creditors of their just and lawful actions, suits, debts, accounts, damages, . .. shall be deemed and taken only as against the person or persons, ... and every of them whose debts, suits, demands, ... or interests by such guileful and convinous devices and practices shall or might be in any wise disturbed, hindered delayed, or defrauded, to be clearly and utterly void; any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.
§ 15-3-5. Fraudulent conveyances, judgments, loans and the like  exceptions.
Section 15-3-3 shall not extend to any estate or interest in any lands, ... which shall be upon good consideration and bona fide lawfully conveyed or assured to any person or persons, ...
In Blount v. Blount, supra, a son made conveyances of all his real and personal property to his father, which left him without any property to satisfy the claims of his wife in her suit for divorce and child support. In a suit to set aside two deeds, the father defended on the ground that the conveyances were to satisfy antecedent debts the son owed him.
The first principle we announced in Blount was that a fraudulent conveyance actually made by two people with the sole purpose of cheating creditors, was void as to such creditors, whether supported by consideration or not. Blount v. Blount, 231 Miss. at 412-13, 95 So.2d at 551-52. We held that the chancellor was not in error in finding that the deeds were fraudulent for this reason alone. Id. at 415, 95 *85 So.2d at 554. See also Uniform Fraudulent Conveyance Act, § 7 (conveyance made with intent to defraud). As evidenced by the annotations to the UFCA, this is the general law reognized in numerous jurisdictions. See, e.g., DeWest Realty Corp. v. Internal Revenue Service, 418 F. Supp. 1274 (D.N.Y. 1976); Kline v. Inland Rubber Corp., 194 Md. 122, 69 A.2d 774 (1949); Joseph P. Manning Co. v. Shinopoulos, 317 Mass. 97, 56 N.E.2d 869 (1944); Krinsky v. Mindick, 100 N.H. 423, 128 A.2d 915 (1957).
The father argued, however, a debtor in failing circumstances might prefer one creditor over another, even though the grantee was one of close family ties, to satisfy a bona fide debt, and such conveyance would be valid, even though it deprived other creditors of assets to satisfy their claims. In that case the father and son claimed the debt due the former was in excess of $21,000. While recognizing this as a valid principle of law, we held it failed because the father produced no records substantiating any loan to his son. We held the burden was upon the father to show by "clear and convincing evidence of a bona fide pre-existing debt in excess of the value of the property conveyed." 231 Miss. 424, 95 So.2d at 557.
We then stated:
The rule is well settled that, in a case of this kind [between near-relatives], where it is claimed that a conveyance was made to satisfy or secure an antecedent indebtedness, there must be clear and convincing proof of the existence of a valid debt, including disclosure of details as to the items and amount of the debt, and it must clearly appear that the conveyance was in fact made in consideration of such debt. The necessity of clear and satisfactory proof of indebtedness particularly exists in the case of conveyances to near relatives, as in the case of conveyances between husband and wife, or between parent and child. 37 C.J.S. Fraudulent Conveyances § 421 by, p. 1265; and cases cited.
Where an immediate member of a family is preferred as a creditor there must be clear and satisfactory proof of a valid and subsisting debt which would be enforced and payment exacted regardless of the fortune or misfortune of the debtor. [citations omitted]
* * * * * *
The burden of proof in this case was on the appellant to show by clear and satisfactory evidence not only a bona fide indebtedness, which was intended to be enforced, but also that the amount thereof was not materially less than the fair and reasonable value of the property conveyed to him; and the appellant failed to make such proof.
Id. at 424-25, 427-28, 95 So.2d at 557-58, 559.
We accordingly held in Blount that the chancellor did not err in setting aside the deeds as fraudulent for lack of consideration as well.
A debtor does have the right to prefer one creditor over another, Fargason v. Oxford Merchantile Co., 78 Miss. 65, 27 So. 877 (1900); Neely v. Rawlings, 64 F.2d 655 (5th Cir.1933), even if that creditor is his wife. And, a conveyance to satisfy a pre-existing debt which equals the value of the property conveyed is valid, even to a spouse, over the claim of other creditors. See: Graham v. Morgan, 83 Miss. 601, 35 So. 874 (1904); Detrio v. Boylan, 190 F.2d 40 (5th Cir.1951). In Reed v. Lavecchia, 187 Miss. 413, 193 So. 439 (1940), we enumerated several "badges of fraud" regarding the issue of a bona fide conveyance:
[I]nadequacy of consideration, transaction not in usual course or mode of doing business, absolute conveyance as security, secrecy, insolvency of grantor, transfer of all his property, attempting to give evidence of fairness by conscripting sister-in-law as a conudit for passing title to the wife, retention of possession, ... relationship of the parties, and transfer to person having no apparent use for the property.
Id. at 424-25, 193 So. at 441.
This case is clearly distinguishable from Blount in several particulars, and the chancellor was not in error when he found *86 that Lucille and Bernie passed a "badges of fraud" test.
While Lucille and Bernie were indeed husband and wife when the deed was executed, in actuality their relationship was by no means a close family tie, but instead was about as hostile and adverse as can be envisioned. Lucille was a creditor trying to protect her own interest. The suspicion which attends a transfer between a husband and wife is not necessarily aroused here, even in the absence of other circumstances shown in this case.
Also, while not intimating that a joint tenant or tenant in common cannot also violate the fraudulent conveyance statute in a conveyance to a remaining owner, we nevertheless note that this was not the classic case of a harried debtor transferring all of his property to a third party. Rather, it was a case of Bernie releasing and conveying to Lucille his interest in their property to her.
Barbee further contends that the value of Bernie's interest grossly exceeded the amount of Bernie's debt to Lucille. In this connection, we have noted above that the appraiser's assessment of the land is by no means clear, as it involves property not in the lawsuit. Lewis's appraisal apparently included 127 acres of Hancock County property which obviously overstated Bernie's interest in the property conveyed. In Lewis's opinion, Bernie's interest was worth $262,500 on October 18; we find this figure highly suspect.[4]
Assuming that Lewis's calculations were substantially correct, however, the chancellor was entitled to consider the following as consideration paid by Lucille:[5]

 Loans from First National Bank for advances to Bernie $ 54,261.17
 Bernie's attorney fees and bond 17,500.00
 Savings of Lucille and children advanced to Bernie 40,000.00
 Sale of cattle proceeds advanced to Bernie 21,000.00
 Lucille's direct investment in the property 37,000.00

We note there was no objection to the introduction into evidence by Lucille of the above funds she paid and advanced Bernie, and there was no contradiction as to any advancement by Pigott. In Blount, when the father attempted to make proof of an indebtedness due him by his son, he produced virtually no records to substantiate any of it. The chancellor rejected his testimony in large part because of his failure to abide by the "best evidence rule" in attempting to establish an indebtedness. 95 So.2d 555.
Aside from the fact this evidence of large sums of money being paid by Lucille was neither contradicted nor objected to by Pigott, and assuming the best evidence rule in some form remains Mississippi Rules of Evidence, § 1002, there remains a large distinction between this case and Blount. In Blount the transactions creating the supposed debt were of comparative recent origin prior to the execution of the deeds from the son to the father. If the father intended to claim the thousands of dollars he purportedly had advanced his son in money and property as a debt due the son to him, it was manifestly strange to the chancellor and to this Court that he kept no records to evidence such debt. The writing the father offered was a meager substitute for proof of a debt. Here the money advanced by Lucille was in property they jointly owned, as an investment for the two *87 of them, and antedating by a number of years the execution of the deed. Records of such advancements over a period of years could have easily been lost or destroyed. Yet, Lucille, in a suit for partition between herself and Bernie clearly would have been entitled to reimbursement for any direct investment such as improvements made to the land.[6]Brunt v. McLaurin, 178 Miss. 86, 172 So. 309 (1937); Bennett v. Bennett, 84 Miss. 493, 36 So. 452 (1904).
As we have also noted, the conveyance to Lucille was not simply to satisfy antecedent debts or advancements, but to induce Lucille to put up money for Bernie's bail and a lawyer, totaling $17,500.[7]
Finally we note the pertinent fact that Lucille had filed for divorce some months earlier, with the property settlement between herself and Bernie unresolved. As a result of Bernie signing over to her the property this removed any such issue from the dispute. It has been held that a transfer of money or property made in good faith between husband and wife as a settlement of property rights and in lieu of alimony in contemplation of divorce proceedings is not without sufficient consideration where the divorce is subsequently obtained. Dixon Lumber Co. v. Peacock, 217 Cal. 415, 19 P.2d 233 (1933); McNally v. Emmettsburg Nat. Bank, 197 Iowa 602, 192 N.W. 925 (1923); Barnes v. American Fertilizer Co., 144 Va. 692, 130 S.E. 902 (1925).
There was clearly no manifest error by the chancellor in finding the conveyance was in good faith and supported by adequate consideration, such finding being within the law of this State and the general prevailing law as to fraudulent conveyances.
Accordingly, the decree of the chancery court is affirmed.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE, PRATHER, ROBERTSON, ANDERSON and GRIFFIN, JJ., concur.
SULLIVAN, J., not participating.
*88 
NOTES
[1] The warranty deed described the Pearl River County property conveyed as follows:

TRACT I:
SE 1/4 of NW 1/4 of Section 21, Township 6 South, Range 16 West, Pearl River County, Mississippi.
TRACT II:
SW 1/4 of SE 1/4 of Section 20, Township 6 South, Range 16 West, Pearl River County, Mississippi; less and except the following described parcel or tract of land: [a four-acre parcel located at the NW corner of SW 1/4 of SE 1/4 of Section 20]
TRACT III:
Beginning at the Northwest corner of the Sli 1/4 of SW 1/4 of Section 21, Township 6 South, Range 16 West, thence run South 183 feet, thence run East 183 feet, thence run North 183 feet, thence run West 183 feet to the place of beginning, containing .80 acres more or less and being a part of the SW 1/4 of SW 1/4 of Section 21, Township 6 South, Range 16 West.
TRACT IV:
SE 1/4 of SE 1/4 of Section 20, Township 6 South, Range 16 West, Pearl River County, Mississippi.
TRACT V:
SW 1/4 of NW 1/4 and NW 1/4 of SW 1/4 of Section 21, Township 6 South, Range 16 West; ALSO [easements and/or right of ways to TRACT V located in adjacent Section 20].
[2] The Pearl River County warranty deed conveyed the following property:

1. SW Quarter of SE Quarter of Section 20, Township 6 South, Range 16 West, Pearl River County, Mississippi, LESS AND EXCEPT: [a four-acre parcel located at the NW corner of the SW Quarter of SE Quarter of Section 20]
2. Commencing at the SE corner of Section 20, Township 6 South, Range 16 West, Pearl River County, Mississippi; thence North 89 degrees 48 minutes West 92.0 feet to the point of beginning; said point of beginning being in the center of black-top road, thence North 89 degrees 48 minutes West 1234.67 feet, thence North 1148.82 feet to the center of above said road, thence South 48 degrees 16 minutes 27 seconds East 457.0 feet along said centerline, thence South 46 degrees 22 minutes 24 seconds East 1034.84 feet along said centerline, thence South 46 degrees 57 minutes 20 seconds East 197.75 feet, more or less, along said centerline to the point of beginning. This parcel containing 16.46 acres, more or less, and being a part of the SE Quarter of Section 20, Township 6 South, Range 16 West, Pearl River County, Mississippi. [Emphasis added]
The Hancock County warranty deed conveyed the following property:
1. NW Quarter of NE Quarter of Section 29, Township 6 South, Range 16 West, Hancock County, Mississippi; and
Begin at SW corner of NE Quarter of NE Quarter of Sectin 29, Township 6 South, Range 16 West, thence run North 1320 feet, then run East 570 feet, thence run South 1320 feet, then run West 570 feet and to the place of beginning; containing 17.25 acres, and being part of the NE Quarter of the NE Quarter of Section 29, Township 6 South, Range 16 West, Hancock County, Mississippi.
2. All that tract or parcel of land lying and being in Sections 28 and 29, Township 6 South, Range 16 West, St. Stephens Meridian, Hancock County, Mississippi described as follows:
Beginning at a point which is at the NW corner of said Section 28, thence South along the West line of said Section 28, a distance of 130 feet, to a point which is in the center of a road, thence South 37 degrees 30 minutes East along the center line of said road, 750 feet, thence South 52 degrees 30 minutes West 533 feet, to a point which is on the East line of aforesaid Section 29, thence South along the East line of said Section 29 a distance of 300 feet, more or less, to a point which is at the SE corner of the NE Quarter of the NE Quarter of said Section 29, thence West along the South line of said NE Quarter of the NE Quarter of Section 29 750 feet to a corner of a tract of land now or formerly owned by Bernie O. Pigott, thence North along the boundary of said Pigott tract 1320 feet, to a point which is on the North line of said Section 29, thence East along said North line of Section 29, a distance of 750 feet, more or less, to the point of beginning; containing 28.24 acres, more or less ...
3. Part of the West Half (W 1/2) of the NW Quarter in Section 28, Township 6 South, Range 16 West, as described in that certain Warranty Deed from Mrs. Maude Wheat, a widow, to Bernie O. Pigott and wife, Lucille Whitaker Pigott, said Warranty Deed having been executed on July 17, 1963. Said property being more particularly described as:
Beginning at a point which is at the SW corner of the NW Quarter of said Section 28, thence North along the West line of said Section 28 a distance of 1226 feet, thence North 52 degrees 30 minutes East 882 feet, to a point which is in the center of Flat Top-Picayune Road, thence Southeasterly along the center line of said Flat Top-Picayune Road 800 feet, thence South 55 degrees West 750 feet, thence East 960 feet, to a point which is in the center of the Nicholson-Kiln Road, at its intersection with the Flat Top-Picayune Road, thence Southeasterly along the center line of said Flat Top-Picayune Road 765 feet, to a point which is on the South line and 1935 feet East of the SW corner of the NW Quarter of said Section 28; thence West along said South line of the NW Quarter of said Section 28, a distance of 1935 feet, more or less, to the point of beginning; containing 39.78 acres, more or less ...
Some of these descriptions have been edited for clarity.
[3] 12 Eliz. I (1570); later 27 Eliz. I (1585); later 29 Eliz., ch. 5.
[4] Lewis's errors were not limited to his appraisal of the property on the Southwest side of the county road.

Lewis found that the value of the land on the Northeast side of the road was worth $1,750 per acre. This figure was obtained by using three comparable sales from the surrounding area. One sale used was Lucille's sale of 179.5 acres to the Mitchells for $200,000. Deducting an estimated $20,000 for improvements, Lewis calculated the land to be worth $180,000, "and dividing that by 179, I came up with around eighteen hundred dollars ($1800.00) an acre." (Vol. IV, p. 327) This $1800/acre was used as a comparable sale for land on the Northeast side of the county road.
While this Court claims no expertise in matters of real estate appraisal, we take judicial notice of the fact that $180,000 divided by 179.5 equals $1002.78, or $1000 an acre.
[5] Barbee's brief avers that Lucille's consideration could be worth no more than these figures, which total up to $169,761.17.
[6] The following improvements were made by Lucille, according to her testimony (and a previous appraisal): two barns, 40-acre lake, a pond, 180 acres of improved pasture land, treated fence posts with net wire and barbed wire on top, water pipe to pastures, concrete watering trough with an automatic float, aluminum gates to all pastures, and cattle lanes.
[7] Insofar as determining whether there has been a compliance with § 15-3-5, § 3 of the UFCA states:

Fair consideration is given for property, or obligation,
(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied,
(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.
In determining what is "fair equivalent" and "not disproportionately small," Courts have stated the consideration should "fairly represent" the value of the property transferred, Schlecht v. Schlecht, 168 Minn. 168, 209 N.W. 883 (1926). Montana Ass'n. of Credit Management v. Hergert, 181 Mont. 442, 593 P.2d 1059 (1979). See also Osawa v. Onishi, 33 Wash.2d 546, 206 P.2d 498 (1949). ("All circumstances considered, there should be a reasonable and fair proportion between the one and the other.") The court will look "to all surrounding circumstances" to determine whether transaction was "fair." John Ownbey Co., Inc. v. C.I.R., 645 F.2d 540 (6th Cir.1981) (interpreting Tennessee Code).