SOUTHWICK, J.,
for the Court:
¶ 1. Blewett W. Thomas brought suit to set aside a conveyance of real property that he alleges was fraudulent as against creditors. The Harrison County Chancery Court found no fraud and denied relief. On appeal Thomas alleges that the chancellor’s findings were opposed by the overwhelming weight of the evidence and ignored- discrepancies in the testimony of two of the defendants, that an incorrect legal standard was applied regarding proof of fraud, and that punitive damages should have been awarded. We find that the chancellor committed no error and affirm.
FACTS
¶ 2. Some of the facts are strongly contested. The following represents the evidence taken in the light that supports the chancellor’s decision, but we also highlight the parties’ disputes. In November 1988, Katherine Chapman’s home was damaged ín a fire. Her two adult sons, Patrick and Lenny, agreed to renovate the home. Patrick was to serve as the contractor and Lenny would assist in the work. In February 1989, a fire insurance settlement of $15,000 was deposited in an account at Merchant’s Bank. It is from that fund that money for the repairs was to be drawn. Mrs. Chapman and both her sons had authority to sign checks, though the majority of those written on the account were signed by Patrick. In order to distinguish this house from two others involved in the case, we note that the house was at 205 Eleanor Drive in Pass Christian.
¶ 3. Patrick Chapman, a few months later, wanted to buy a house located' at 141 Holiday Pass. This home is at the center of the present litigation. He gave a down payment of $500 to the seller on August 1, 1989. ' The purchase price was $16,655. Though the previously mentioned joint account was to fund repairs to the senior Mrs. Chapman’s home, testimony was accepted by the chancellor that not long after the account was opened it was used by the brothers for other purposes. What those purposes were is disputed. Patrick borrowed $10,000 from a bank for the purchase of the Holiday Pass house and placed those funds into the joint account. In October 1989, Lenny deposited into that *800 same account $6000 that he had received when he retired from the National Guard. The Chapman brothers testified that this $6000 was being loaned to Patrick for the balance of the purchase price on the Holiday Pass house. On October 20, 1989, Patrick wrote a check on the joint account for $16,155 in order to complete the purchase. Lenny agreed that the $6,000 loan would be interest free. Also accepted by the chancellor was testimony that Lenny was named as a grantee on the deed to Patrick’s home as a means to secure his loan on the property.
¶ 4. As a preview of the issue that we face, we note here that the nature of Lenny’s interest in the 141 Holiday Pass property is the key question in this case. One of Lenny’s subsequent creditors, the appellant Blewett Thomas, claims that he is entitled to execute a judgment against Lenny’s interest in this property. We will explain those facts after the narrative arrives at that point.
¶ 5. Patrick did not move into the home until mid-1991 since substantial repairs were first needed. The chancellor found that Lenny performed no work on the home, even though his name was on the deed, and that the repairs were largely completed through Patrick’s “sweat equity.” Patrick’s work and expenditures, with the $6,000 exception, were according to the chancellor “solely responsible for the home’s present day value.” Even after moving in, Patrick acquired a $10,010 loan from Merchants Bank in 1991 that would pay for further remodeling. There was testimony that the bank’s loan officer required Lenny to sign both the note and deed of trust since his name was listed on the deed. Patrick made all of the loan payments from his personal checking accounts; Lenny never made any loan payment. In early 1992, Patrick and his wife, Elizabeth, moved into the renovated home.
¶ 6. Three years later, in August 1995, Patrick applied at Magnolia Federal Bank for a home loan. The suggestion this time was, instead of having Lenny sign the paperwork, to have Lenny removed as a record title owner. Additionally, the bank wanted Patrick’s wife Elizabeth added as a joint owner. On August 31, 1995, Patrick and Elizabeth signed the loan application. On September 26, Lenny met with Patrick’s attorney. He signed the documents necessary to convey his interest to Patrick and Elizabeth, and a week later the deed was recorded.
¶ 7. Patrick had not yet repaid Lenny the 1989 interest-free $6000 loan. Patrick promised to do so after getting the new loan. On October 27, Patrick and Elizabeth Chapman executed a note and First Deed of Trust in the sum of $30,000. Patrick paid Lenny $6200, finally satisfying the 1989 debt. A few months before Patrick’s final relevant loan on the property, Blewett Thomas initiated suit against Lenny stemming from a 1994 auto accident. The complaint was filed in Harrison County Court on July 5, 1995. An entry of default occurred on August 17. On September 15, Lenny appeared before the court for a hearing on damages. The chancellor found damages to be $10,000, but an order so stating was not entered until January 1996.
¶ 8. The obvious problem is that the events that the Chapmans argue were completely innocent of connection with the claim brought by Thomas, occurred with a somewhat startling coincidence in time to Thomas’s suit over the damage to his automobile. Perhaps not believing all to be unconnected, Thomas on September 13, 1996, brought the suit whose appeal is now before us. Thomas alleged that the September 26, 1995 conveyance by Lenny to Elizabeth and Patrick was a fraudulent attempt to defeat his claim as Lenny’s judgment creditor. Thomas sought to have the conveyance set aside. After an evidentiary hearing, the chancellor found that the conveyance was valid, ruling it to have been made in good faith and for valid consideration. Thomas appeals.
*801 DISCUSSION
¶ 9. We discuss in a later issue the requirements of a cause of action to set aside a conveyance as being fraudulent against creditors. Here we review the sharply disputed facts. Since we hold that the chancellor was not manifestly in error in his fact-finding, it will be a clearer task to determine whether, based on those facts, a claim of fraud was made.
¶ 10. A chancellor has broad discretion in adjudicating facts. This Court recognizes that discretion by upholding a chancellor’s fact-findings provided “the evidence in the record reasonably supports those findings.” Estate of Chambers v. Jackson, 711 So.2d 878, 880-81 (Miss. 1998). Such findings will not be disturbed unless they were clearly erroneous or an erroneous legal standard was applied. I'd. at 881.

1. & 2. Weight of the evidence and abuse of discretion in fact-finding.

¶ 11. Thomas’s first issue addresses the standard for reviewing a chancellor’s fact-findings, and the second argues that the Chapmans’ testimony had too many discrepancies and contradictions to be believed. We have noted already the discretion that we give to a trial court’s fact-findings. We proceed to examine the alleged overwhelming weight of evidence that opposes those findings.
¶ 12. Thomas points to Patrick’s testimony that he had initially purchased the 141 Holiday Pass home as an investment, but that he would ultimately move there. A few questions later in the examination, Patrick stated that in 1989 he had also purchased a house across the street, at 142 Holiday Pass. Lenny’s testimony, which Thomas emphasizes was without the benefit of hearing Patrick’s answers, was that in 1989 his brother was in dire need of a home for his family. Thomas finds suspicious that Patrick and his family did not move into the 141 Holiday Pass house until 1992, following the renovations. The Chapmans acknowledge that Patrick and his family lived across the street from the house in question, but with cyclical degrees of zealousness the repairs were conducted over a three-year period. It is evident that the work was finished and Patrick moved in three years before Lenny had the automobile accident that underlies Thomas’s claim.
¶ 13. Thomas also discussed evidence that Patrick was able to borrow other money in 1989, and no reason was shown for needing the $6,000 from Lenny that was the explanation for Lenny being on the 1989 deed. All parties agree that almost $10,500 from a bank loan were used. There was a deposit ten days after the loan and before the purchase of the 141 Holiday house of another $8,000. The source of that money was never made clear. Patrick stated “I really [am not] sure if it was a loan or if that was money that I had just deposited in there.” Thomas says from this that the chancellor was required to find that Patrick did not need Lenny’s loan to buy the house. However, whether the $8,000 was used for something else in Patrick’s business or personal affairs or instead just remained in the account was not explored.
¶ 14. On the other hand, the favorable interest rate from Lenny — 0%—was not matched by any other lender. There was also evidence that $6,000 was what Lenny had recently received from the National Guard and was available for a fraternal loan. There was no evidence that the bank would have loaned 100% of the value of the home and not required some equity.
¶ 15. Additional suspicions are raised that Lenny was named as a grantee in the 1989 deed, instead of the deed being to Patrick and á deed of trust then granted to Lenny. Lenny stated that he was unfamiliar with deeds of trust, which Thomas argues is unbelievable. Thomas also disputes the consistency of the testimony as to whether the bank or instead Patrick suggested that Lenny be a .grantee in the deed. In answer to Thomas’s question of *802 “[wjhose idea was it to put you on the deed,” Lenny said “[tjhat was the bank, as a security for my money, and it was my brother’s idea so I would have security for my loan.... ” That may be a confusing answer, but we cannot agree with Thomas that it shows an irreconcilable conflict in Lenny’s testimony that undermines his credibility. It does show that some additional clarification could have been sought if the point was important.
¶ 16. From all this Thomas states that there were too many inconsistencies to believe that Patrick needed Lenny’s money to buy the home. In fact, Thomas suggests, all this proves that Lenny was intended from the beginning to be an owner of the property, not just a lender. Thomas alleges that the proof solely supports that the brothers meant to be joint owners and that it was an investment for them both. We agree that there was evidence that raised questions about what occurred. However, sifting through the conflicting evidence and inferences, the chancellor made findings that were not manifestly in error regarding the transactions on the 141 Holiday Pass home. Perhaps most persuasively, what ambiguity there might be by some of the early financing, it is uncontroverted that Patrick and his family moved into the home in 1992 and have lived there ever since.
¶ 17. There is also on appeal a challenge to the evidence regarding when Patrick first claimed the house in issue here at 141 Holiday Pass as a homestead. The homestead issue is not well-explained in the record, as the records on the matter were not introduced until after trial and therefore were not discussed by the witnesses. Thomas characterizes Patrick’s testimony as an admission to lying to the tax assessor regarding his homestead. We cannot see that, though the testimony does show Patrick’s uncertainty as to when he declared 141 Holiday Pass as his homestead instead of the across-the-street property at 142 Holiday Pass where he lived during the renovations. The tax statements for 1994 and 1995 were mailed to the 141 Holiday Pass address but show 142 Holiday Pass as the homestead. A declaration of homestead is certainly a factor in resolving what happened in this case, but it is one of many.
¶ 18. Additional questions are raised by the evidence regarding when Lenny learned of Thomas’s suit against him. The deed from Lenny to Patrick was eleven days after the judgment for $10,000 was entered against Lenny. At that time there had been no claim for the home made by Thomas, though there was as yet no reason since he had just received the money judgment. The repayment of the six-year old debt for $6,000 did not occur until a month after the deed. The money that Patrick borrowed in 1995 was not for expenses specifically dealing with the house, but was for other debts.
¶ 19. Thomas disagrees with the plausibility of both Chapman brothers’ testimony that the deed was unconnected to Lenny’s lawsuit problems. Thomas calls each “evasive” in answers regarding when each learned of the litigation. Patrick denied knowing of the suit against his brother until after the deed regarding the property had been executed and he had repaid the loan. A title opinion was prepared for the transaction which revealed no claims against the property, as no Us pendens had been filed, nor did the opinion reveal the personal injury suit against Lenny. Apparently, until a September 1996 judgment debtor exam Thomas was unaware of the potential for the claim that he is now making regarding Lenny’s interest in Patrick’s home. That was a year after the deed. No one suggests that Thomas contacted Patrick before these transactions were complete.
¶ 20. At the time of trial Lenny had not had regular employment for several years and apparently had no savings. To Thomas, Lenny’s lack of concern for the $6,000, if indeed it was only a loan waiting to be repaid, strains credulity. The evidence on the other hand does not show that Lenny *803 was insolvent or had a need for the $6,000 during the period before the 1995 deed. The home first mentioned in the facts, the one that in 1988 was being lived in by the brothers’ mother - but which burned, was Lenny’s home beginning in 1992. It -does appear that he had no equity in the home and had never paid his mother any part of the purchase price. He owned a car. Perhaps there is no evidence to support wealth, but destitution does not appear from these facts either.
¶ 21. Though we agree with Thomas’s statements regarding possible doubts and the standards to apply to testimony, we find nothing persuasive regarding the need to reverse the chancellor. Patrick began the process of refinancing on the house before any hearing on damages in the personal injury suit. There is sufficient if not uncontroverted evidence that this house was to be the residence for Patrick Chapman and his family from the beginning, that the commencement of refinancing was unconnected to any litigation about Lenny, and that the interest of the new lender in removing the defect in the record regarding Patrick’s title was genuine and not an after-the-fact pretext created by Patrick or Lenny.

3. Application of correct legal standard for fraudulent conveyance.

¶ 22. Thomas maintains that the chancellor applied the incorrect legal standard .for determining whether this conveyance was fraudulent and should be set aside. The claim is based on a statute last amended in 1857, so some of the language is archaic:
Every gift, grant, or conveyance of lands, tenements, or hereditaments, goods or chattels, or of any rent, common or other profit or charge out of the same, by writing or otherwise, and every bond, suit, judgment, or execution had or made and contrived of malice, fraud, covin, collusion, or guile, to the intent or purpose to delay, hinder, or defraud creditors of their just and lawful actions, suits, debts, accounts, damages, penalties, or forfeitures,' or to defraud or deceive those who shall purchase the same lands, tenements, or hereditaments, or any rent, profit, or commodity out of them, shall be deemed and taken only as against the person or persons, his, her, or their heirs, successors, executors, administrators, or assigns, and every of them whose debts, suits, demands, estates, or interests by such guileful and covinous devices and practices shall or might be in any wise disturbed, hindered, delayed, or defrauded, to be clearly and utterly void; any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding....
Miss.Code Ann. § 15-8-3 (Rev.1995).
¶ 23. In the midst of all that verbiage, the statute provides that if any conveyance is fraudulent against creditors, it is void as to them though otherwise effective. The supreme court has looked for indicia of fraud in disputes such as this. In the principal case discussed by both parties, the court set out some guideposts:
On the issue as to whether there was a bona fide sale from Jos. V. Lavecchia to his sister-in-law, the following well-known labels and badges of fraud are disclosed by the evidence: [1] Inadequacy of considération, [2] transaction not in usual course or mode of doing business, [3] absolute conveyance as security, [4] secrecy, [5] insolvency of grantor, [6] transfer of all his property, [7] attempt to give evidence of fairness by conscripting sister-in-law as a conduit for passing title to the wife, [8] retention of possession, [9] failure to take a list of the property covered by the conveyance which was commingled with some furniture and fixtures belonging to his father’s estate, [10] relationship of the parties, and [11] transfer to person having no apparent use for the property.
Reed v. Lavecchia, 187 Miss. 413, 193 So. 439, 441 (1940). In addition, Thomas argues that the conveyance was in anticipation of litigation.
*804 ¶ 24. The factors that the chancellor considered, and his response to them, were these:
a) Transfer in anticipation of litigation. The chancellor found no credible evidence that “the defendants” knew of the pen-dency of the action until after the conveyance by Lenny to Patrick. Of course, Lenny knew of the suit as he had appeared at a hearing on damages before the deed was executed. However, there is no clear evidence that Patrick knew of the suit.
b) Length of delay in recording deed. The deed from Lenny to Patrick was recorded almost immediately.
c) Secrecy. There was no secrecy regarding the conveyance.
d) Transfer of all of grantor’s property. The record indicates Lenny had other property, and thus this deed did not leave him without assets.
e) Failure of grantee to testify. All participants in the conveyance testified.
f) Relationship of grantor to grantee. There was a close relationship.
g) Insolvency. The chancellor found Lenny to be solvent.
h) Retention of possession or control. After the deed, and indeed at all times since the initial deed, the chancellor found that Lenny had no possession of the 141 Holiday Pass house and exercised no control.
i) Inadequacy of consideration. Whether Lenny actually loaned $6,000 for the 1989 purchase or instead was himself investing in the property was a fact question resolved in favor of the money being a loan. Since the money was a contribution to a $16,655 sales price set in an arms length transaction with another person, there is no legitimate question about adequacy.
¶ 25. It is the first factor that makes the transaction suspicious; it is the absence of most of the rest of the factors that fully justifies the chancellor’s conclusion that there was no fraud.
¶ 26. Another statute provides that even if the transaction was made to favor one creditor over another, i.e., even if Lenny and Patrick knew full well of Thomas’s claim and Lenny decided to favor his brother, that is not to be set aside if his brother was a pre-existing creditor and the transfer was “upon good consideration .... ” Miss.Code Ann., § 15-3-5 (Rev.1995). However, that statute has been interpreted to mean that a “ ‘deed made upon a valuable consideration, but not bona fide, — that is, with a fraudulent intent, — is void against creditors of the grantor as though it were voluntary [i.e., without consideration].’ ” Blount v. Blount, 231 Miss. 398, 412-13, 95 So.2d 545, 551 (1957) (quoting 2 Pomeroy’s Equity Jurisprudence ¶ 969 (3d ed.) at 1793). Nonetheless, the court held “that a debtor in failing circumstances may prefer one creditor to another, even though the creditor be his father, and that he may convey or encumber his property to secure a bona fide debt, even though the effect of the conveyance or encumbrance is to deprive other creditors, equally meritorious, of the opportunity to obtain security for their claims.” Blount, 95 So.2d at 554. However, there must be “clear and convincing evidence of a bona fide preexisting debt in excess of the value of the property conveyed.” Id. at 554-55.
¶ 27. The chancellor found that the conveyance was bona fide, i.e., in good faith and not intended to defraud Thomas. Whether there was a valid pre-existing debt is contested. Thomas refers us to the facts of the just-quoted Blount decision to show that there was inadequate proof of a debt. Mrs. Blount brought suit against her husband to set aside his deed to his father. She alleged that the conveyance was executed in order to defraud her of alimony and child support. Id. at 547. The husband and his father argued that the conveyance was the result of a preexisting debt in their jointly operated dairy business. Id. at 549. The father *805 and son alleged that there had been an account book but it no longer existed. There were some canceled checks, but they totaled only a small part of the alleged $43,000 debt. Relying on the absence of adequate evidence of this prior debt, the court found the conveyance to have been fraudulent. Id. at 555.
¶ 28. In the present case, there was no specific loan document. The chancellor found that the debt existed as of October 10, 1989, that it was based on an oral agreement between Patrick and Lenny, and that Lenny’s name being on the deed to the subject property even though he had no connection thereafter with the property was an adequate written record of security for repayment of the debt.
¶ 29. In a later precedent, a wife made several payments on her husband’s behalf for attorneys’ fees and bond payments while he was in prison. Barbee v. Pigott, 507 So.2d 77, 81 (Miss.1987). In exchange, the husband agreed to execute a warranty deed in favor of the wife conveying his share of their property held in joint tenancy. Id. He did so in October 1979. Three months later, the plaintiff sued the prisoner-husband in tort. Judgment was rendered in favor of the appellant on July 1, 1980. Id. On August 1, 1980, the wife sold part of her interest in the property. Barbee, 507 So.2d at 81. The appellant then commenced an action to have the October 1979 conveyance set aside as fraudulent. Id. at 82. On appeal the supreme court found the conveyance to be valid. Id. at 87. The court held that there was adequate evidence of the wife’s payments on the imprisoned husband’s behalf. Moreover, the parties were trying to resolve a property settlement in anticipation of divorce. “It has been held that a transfer of money or property made in good faith between husband and wife as a settlement of property rights and in lieu of alimony in contemplation of divorce proceedings is not without sufficient consideration.... ” Id. at 87.
¶ 30. It is true that in the present case there was no explicit evidence of a debt. Neither Blount nor Barbee requires unambiguous written evidence of the existence of a debt. Each does require that there be something that clearly and convincingly proves the debt. Lenny was the grantee in the 1989 deed. A deposit of $6,000 in the joint account appears, which is in the amount and at a time consistent with Lenny’s receipt of money from the National Guard. Lenny had no further connection with the home. This was a sufficient basis to find the existence of a debt.
¶ 31. The chancellor was warranted in finding that clear and convincing evidence of indebtedness existed between Patrick and Lenny and that the conveyance was free of fraud.
A Punitive damages
¶ 32. Because we hold the chancellor was justified in finding that there was no fraud, the issue of exemplary damages for that conduct is moot.
¶ 33. THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING, P.J., BRIDGES, COLEMAN, DIAZ, IRVING, LEE, JJ., CONCUR.
PAYNE AND THOMAS, JJ., NOT PARTICIPATING.