555 So.2d 704 (1989)
SOUTHEAST BANK OF BROWARD, FLORIDA, N.A.
v.
I.P. SARULLO ENTERPRISES, INC., and M.C. Clark.
No. 07-CA-58657.
Supreme Court of Mississippi.
December 20, 1989.
*705 Douglas C. Wynn, Wynn & Mitchell, Greenville, for appellant.
Hainon A. Miller, Greenville, for appellees.
Before ROY NOBLE LEE, C.J., and PRATHER and ANDERSON, JJ.
PRATHER, Justice, for the Court:
This action by a judgment creditor, Southeast Bank of Broward, Florida, N.A. (Bank), seeks to set aside a quitclaim deed as fraudulent. The legal title was held by a corporation, I.P. Sarullo, Enterprises, Inc., (IPS) and was conveyed by its president, Sonny Sarullo, to his wife, Martha Carol (M.C.) Clark. The Bank named as defendants the corporation and the wife in order to set aside the deed and subject the land to its judgment lien. The Chancery Court of Washington County held the conveyance fraudulent, and this Court affirms that holding, but reverses on the trial court's ordering reimbursement to the wife of certain payments made in connection with the property.
The Bank's appeal of the trial court's decision to this Court, assigns six (6) points as error. Several of these assigned errors are duplicative and are condensed into four (4) errors, which are as follows:
(1) THE CONVEYANCE TO M.C. CLARK OF THE LAKE WASHINGTON PROPERTY WAS A FRAUDULENT CONVEYANCE, MADE WITH THE INTENT TO HINDER AND DEFRAUD CREDITORS.
(2) THE CHANCELLOR ERRED WHEN HE ALLOWED REIMBURSEMENT TO M.C. CLARK FOR PAYMENTS SHE MADE ON THE LAKE WASHINGTON PROPERTY.
(3) THE CHANCELLOR ERRED WHEN HE FOUND THAT THE PAYMENT OF THE SECOND MORTGAGE BY MRS. SARULLO'S TRUST FUND CONSTITUTED A GIFT TO APPELLEE M.C. CLARK.
(4) THE CHANCELLOR ERRED WHEN HE REFUSED TO ALLOW THE ASSESSMENT OF PUNITIVE DAMAGES AGAINST IPS AND M.C. CLARK, INCLUDING ATTORNEY'S FEES.

I.
I.P. Sarullo Enterprises, Inc. (IPS) is a Mississippi corporation whose stock is wholly owned by Mrs. Frances Sarullo, the mother of Salvadore (Sonny) Sarullo, president of IPS. The company was engaged in the contracting and construction business, and at all times pertinent to this litigation, Sarullo was "in charge of the business."
On November 1, 1977, IPS purchased a house and lot located on Lake Washington, in Washington County, approximately 35 miles south of Greenville, from Stanley Ingram for $50,000.00. Of this figure, $10,000.00 was paid by IPS, with the remainder due in four (4) equal installments payable each February 15th from 1978-1981, at 9% interest, and secured by a Deed of Trust in favor of the sellers. The house was initially insured by IPS for $60,000.00, and coverage was later increased to $70,000.00.
*706 On June 1, 1978, IPS was engaged in the construction business in Florida. On that day, IPS negotiated an unsecured $52,000.00 loan with the appellant Bank, with S. Sarullo personally guaranteeing the loan. When the note became due on September 1, 1978, the IPS corporation was insolvent and its developer in Florida was in bankruptcy. The appellee corporation has never denied its insolvency or the fact that the company's only asset was the Lake Washington property.
Sarullo and Martha Carol Clark were married on October 6, 1978. By a quitclaim deed dated November 3, 1978 and signed by Sarullo as president, IPS conveyed the subject house and lot in question to "M.C. Clark"[1] for a consideration listed as "Ten Dollars ($10.00) cash and other good and valuable considerations."
With the default in payment of its $52,000.00 loan to IPS the Bank filed suit in December, 1978, in Florida. On February 16, 1979, the quitclaim deed of the subject house and lot from IPS to M.C. Clark was recorded in Washington County. Thereafter, the Bank obtained a default judgment against IPS and Sarullo jointly and severally in the amount of $57,962.43 and a separate judgment against IPS for $1,427.47, all on March 2, 1979.
Following the entry of the default judgment against IPS and Sarullo, Sarullo organized two other corporations with the aid of his wife, to enable him to "get back on my feet and try to get some business going again." One corporation, K.A.P.P. Company, Inc. (KAPP) was organized with M.C. Clark as the sole stockholder and a second corporation, styled M.C. Clark Company, Inc. (MCC) was formed, again with his wife as the only stockholder, which, being totally owned by a female, qualified for government construction contracts for minority businesses.
Sarullo was the president for both of these corporations. He had the authority to hire and fire all employees and also determined their salaries. Clark was a schoolteacher before she married Sarullo and knew very little about the construction business. As a consequence, Sarullo determined which contracts the corporations would bid on, the amount of the bids, and had the primary responsibility for handling the day-to-day affairs of the companies, although his wife played a very small role in the business affairs of the corporations because, in his words, "she is required to."
The Bank domesticated its March 2, 1979 Florida judgment in the Circuit Court of Washington County on April 9, 1980, obtaining a joint and several judgment against IPS and Sarullo for $68,404.06 and a separate judgment against IPS in the amount of $1,696.94. A July, 1980 garnishment netted $544.41, and no other amount had been collected on the outstanding judgment at the time of trial. The Bank then sought to turn to IPS's only asset at the time of this loan, which was the Lake Washington house and lot and filed on July 13, 1983 this chancery court action to set aside the IPS quitclaim deed to "M.C. Clark" as a fraudulent conveyance and subject the land to its judgment lien.
The only witnesses presented at trial were Sarullo, Patsy Woody, a vice-president of the Bank, two real estate appraisers, and Stan Ingram. Perhaps the most crucial potential witness, M.C. Clark, never testified.
At the trial, which was held on April 10, 1986, John Wise, called as an expert witness for the appellees, placed the value of the house in November 1978 (the time of the transfer from IPS to M.C. Clark) at $38,000 to $40,000, a $10-12,000 decrease in value from the purchase price paid only a year earlier. Joan Nye, the Bank's expert witness, called in rebuttal, challenged the accuracy of Wise's figures. In its written opinion, the trial court chose not to rely on Wise's calculations.[2]
*707 Following the presentation of evidence by each side, the trial court found that no real consideration was paid for the quitclaim deed by M.C. Clark, that no debts had been assumed for the transfer, and that the probable value of the property "substantially exceeded" the amounts actually paid for it, both at the time of the transfer, and those payments later made by KAPP and MCC on Clark's "behalf." As a consequence, the court found that the transfer of the property from IPS to Clark was clearly a fraudulent conveyance within the meaning of § 15-3-3, M.C.A. Ann. (1972 and Supp. 1989), and should therefore be set aside, with the property in question being subjected to the lien of the Bank's joint and several judgment against IPS and S. Sarullo individually for $68,404.06, plus interest.
However, the Court also found that Clark should be reimbursed for the $34,404.50 paid by MCC and KAPP on the Deed of Trust covering the Lake Washington property. Finally, the trial court found that the $10,000.00 payment from Mrs. Sarullo's trust fund, covering the second Deed of Trust, constituted a "gift" to Clark, and should therefore also be paid to her out of the judicial sale of the house.
Concerning the Bank's claim for punitive damages and attorney's fees, the trial court denied this claim, holding that the actions of Clark were not so gross or malicious so as to justify the awarding of such damages and/or fees. No specific mention was made of IPS's actions. Following this decision, the Bank perfected its appeal to this Court.

II.

WAS THE CONVEYANCE TO M.C. CLARK OF THE LAKE WASHINGTON PROPERTY A FRAUDULENT CONVEYANCE, MADE WITH THE INTENT TO HINDER AND DEFRAUD CREDITORS?
Since this question has already been answered in the affirmative by the trial court and is not challenged by cross-appeal of the appellees and is amply supported by the evidence, it does not necessitate a lengthy discussion. However, a consideration of the correctness of the trial court's holding on this point is necessary to address the other assignments.
Appellant asserts that the conveyance in question was a "voluntary conveyance," without consideration, but with the participation of M.C. Clark, and that under Mississippi law such a voluntary conveyance is presumed to be fraudulent as to creditors. Barbee v. Pigott, 507 So.2d 77 (Miss. 1987); Morgan v. Sauls, 413 So.2d 370 (Miss. 1982); Hudson v. Allen, 313 So.2d 401 (Miss. 1975).
It has been held that "transactions between husband and wife will be viewed with suspicion and, to prevent fraud as to creditors, they will be closely scrutinized to see that they are fair and honest." Fidelity & Deposit Co. of Maryland v. Lovell, 108 F. Supp. 360, 365 (S.D.Miss. 1952) (quoting 37 C.J.S., Fraudulent Conveyances, § 252, p. 1085). Other cases have gone further, holding that when a voluntary conveyance is made between husband and wife, without consideration, it is presumptively fraudulent. First National Bank in Kearney v. Bunn, 195 Neb. 829, 241 N.W.2d 127, 128 (1976); Miami National Bank v. Willens, 410 Pa. 505, 190 A.2d 438, 439 (1963); Bank of Atkins v. Teague, 205 Ark. 38, 166 S.W.2d 1017, 1018-19 (1942).
When examining a conveyance to determine if it is fraudulent, a court searches for certain "badges of fraud," or suspicious circumstances, which usually accompany a fraudulent conveyance. Reed v. Lavecchia, 187 Miss. 413, 193 So. 439 (1940). In the case sub judice, there are numerous badges of fraud present:
(1) Inadequacy of consideration  The recited consideration in the quitclaim deed was "$10.00 and other good and valuable considerations" for a piece of property worth at the very least $38,000 to $40,000, with the actual value possibly being greater. Dehmer v. Temple, 44 B.R. 992, 996 (S.D.Miss. 1984); Oury v. Annotti, 113 R.I. 506, 324 A.2d 325, 327 n. 2 (1974); Waukesha County Department of Social Services v. Loper, 53 Wis.2d 713, 193 N.W.2d 679, *708 682 (1972). See also, 37 C.J.S. § 81. The trial court found no real consideration.
(2) Transfer in anticipation of possible future litigation  The transfer took place after the debtor-creditor relationship arose and after IPS had defaulted on the $52,000 loan it had received from the Bank. "The usual case of a claim of fraudulent conveyance as to a subsequent tort claimant arises where the tort is committed, then a conveyance is made with intent to avoid a possible later judgment." Bank of Josephine v. Hopson, 516 S.W.2d 339, 341-42 (Ky.App. 1974); Watson v. Harris, 435 S.W.2d 667, 672 (Mo. 1968). Morgan v. Sauls, supra. See also, 37 C.J.S. § 82. No doubt IPS anticipated litigation on the defaulted loan.
(3) Length of delay in recording the deed  The deed was dated November 3, 1978 but was not recorded until February 16, 1979. See 37 C.J.S. § 85. The Bank filed suit in December, 1978.
(4) Secrecy  The conveyance was made to "M.C. Clark" rather than "Martha Carol Clark" or "Martha Carol Clark Sarullo." During Sarullo's testimony at trial, he referred to his wife as "Martha Carol" or "Carol". He never referred to her as "M.C." See 37 C.J.S. § 86.
(5) Transfer of all the grantor's property  It was admitted at trial that IPS had no other assets at the time of the conveyance, a finding specifically noted in the trial court's ruling. Dehmer, supra at 996. See also, 37 C.J.S. § 89.
(6) Failure of the grantee to testify  M.C. Clark never testified at trial, creating a presumption that she could not have testified to the "bona fides" of the transaction or she would have done so. Nashville Milk Producers v. Alston, 43 Tenn. App. 257, 307 S.W.2d 66, 70 (1957). See also, 37 C.J.S. § 91.
(7) Relationship of the grantor to the grantee  Here, the grantee (Clark) was married to the president of the grantor corporation (Sarullo). Such a relationship, while not always considered to be a badge of fraud, is nonetheless always deserving of close scrutiny. Montana National Bank v. Michels, 631 P.2d 1260, 1263 (Mont. 1981). See also, 37 C.J.S. § 96.
Additionally, the relationship of the parties here is that of a corporate officer, S. Sarullo as president, conveying corporate property to his wife. In this case, there is no need to address the potential liability of Sarullo as president of IPS and of further seeking to pierce the corporate entity of IPS to impose liability upon Sarullo individually. This is so because Sarullo personally guaranteed this loan, and the judgment of the Bank is jointly and severally against both Sarullo and the corporation.
(8) Insolvency  After execution of the deed in question by IPS, the corporation was insolvent.
(9) Control  Sonny Sarullo used the property as a residence for himself and after he moved, permitted his son to rent the house.
It is therefore clear that the conveyance of the Lake Washington property was a fraudulent conveyance within the meaning of § 15-3-3 of M.C.A., which reads in pertinent part as follows:
Every gift, grant, or conveyance of lands ... by writing or otherwise ... had or made and contrived of malice, fraud, covin, collusion, or guile, to the intent or purpose to delay, hinder, or defraud creditors of their just and lawful actions, suits, debts, accounts, damages, penalties, or forfeitures .. . shall be deemed and taken only as against the person or persons, his, her, or their heirs, successors, executors, administrators, or assigns, and every of them whose debts, suits, demands, estates, or interests by such guileful and covinous devices and practices shall or might be in any wise disturbed, hindered, delayed, or defrauded, to be clearly and utterly void ...
Section 15-3-5 provides two (2) exceptions to the coverage of § 15-3-3: (1) where the conveyance was made upon good consideration and lawfully conveyed; and (2) where the debts were contracted after the fraudulent act occurred. Neither of these exceptions applies here. The conveyance was without consideration. Also, the loan to IPS was made in June 1978 and the *709 corporation defaulted on the loan in September of that same year. The quitclaim deed was dated November 3, 1978, meaning the debt was "contracted" before the property was ever conveyed. Therefore, neither of these exceptions is applicable.
This Court holds that the chancellor's ruling on this point was amply supported by the facts of the case, and therefore, he was correct in ruling that the conveyance should be set aside.

III.

DID THE CHANCELLOR ERR WHEN HE ALLOWED REIMBURSEMENT TO M.C. CLARK FOR PAYMENTS SHE MADE ON THE LAKE WASHINGTON PROPERTY?
This assignment provides the heart of the Bank's claim. After finding that IPS's conveyance of the property to Clark was fraudulent, the trial court ruled that Clark was entitled to some $44,000.00 in reimbursements for payments made. This decision was made despite the fact that the appellees never requested such a remedy. The Bank now contends that this ruling was improper.

A.
On initial consideration here is the authority of the chancellor to entertain this issue absent any request in the pleadings for a credit to be given to M.C. Clark Sarullo for monies expended in satisfaction of the Ingram's deed of trust. The answer filed by M.C. Clark did not request a credit, but proof was offered without objection as to the source of payments. It is uncertain as to whether the proof was offered for the purpose of establishing consideration for the conveyance or whether for the purpose of seeking reimbursement.
If the purpose was for the latter reason, this Court has held that issues not raised by the pleadings, but tried by expressed or implied consent, shall be treated as if raised by the pleadings. Queen v. Queen, 551 So.2d 197 (Miss. 1989); Rankin v. Brokman, 502 So.2d 644, 646 (Miss. 1987). Assuming, but not deciding, that the issue was properly raised by implied consent, this Court now addresses the evidentiary sufficiency of the award.

B.
It has been held that, in any conveyance of property involving close relatives, in this case husband and wife, the burden of proof falls on the grantee (Clark) to show by clear and satisfactory evidence not only a bona fide indebtedness, which was intended to be enforced, but also that the amount thereof was not materially less than the fair and reasonable value conveyed to [her]. Barbee v. Pigott, supra.
The chancellor relied upon the general rule recited in 37 Am.Jur.2d, Fraudulent Conveyance § 130 as a basis for his opinion, which states:
"If the transferee is shown to be innocent of fraud, he may be allowed credit for any payments that he may have made in good faith. Furthermore, constructive fraud does not preclude him from reimbursement on account of sums which he is shown to have expended for the benefit or preservation of the property. Moreover, in the majority of cases, a fraudulent grantee, whether guilty of actual or of only constructive fraud, has been held entitled to set off against rents and profits at least some of the expenditures he has made in relation to the property conveyed, the theory of these cases being that the creditor is entitled merely to be placed as nearly as possible in the position he would have been in if the conveyance had never in fact been made and that the expenditures inured to the benefit of the defrauded creditors."
The chancellor also relied upon Morgan v. Sauls, 413 So.2d 370, (Miss. 1982), a fraudulent conveyance case in which the Supreme Court reversed and remanded as to one conveyance. The part of the opinion held applicable by the chancellor reads:
"... [T]hen, the chancellor should determine whether these grantees should be reimbursed from any sale of the property to the extent of their payments on the note and deed of trust against the land, plus lawful interest... ."

*710 C.
The facts that relate to payment of the original purchase price of the house and lot for $50,000.00 are important to a resolution of this issue. The down payment of $10,000.00 was paid by IPS, with four equal installments due February 15 from 1978-1981, plus interest at 9%.
In order to make the first payment due on February 15, 1978, the company borrowed in March, 1978, $10,000.00 from First National Bank of Jackson (now Trustmark), secured by a second deed of trust on the Lake Washington property. The installment was then paid to the Ingrams. Around August 10, 1979, the Second Deed of Trust held by First National Bank of Jackson was fully paid and satisfied.
There is some conflict in the appellee's different versions of how the loan was paid. Sarullo testified that the First National Bank loan was paid off through money provided by his mother's trust fund. However, M.C. Clark, in her responses to the Bank's interrogatories stated that the funds were provided by her husband's personal funds. In Sarullo's answers to interrogatories, he adopted his wife's response as his own. In its opinion, the trial court found that the loan was paid off through Mrs. Frances Sarullo's trust fund as a gift to her daughter-in-law. In any event, it seems clear that M.C. Clark did not pay off any portion of this $10,000.00 (plus interest) debt, and the chancellor found that the money came from Frances Sarullo's trust and that it was a gift to Martha Carol Sarullo, but no fact in the record supports the gift theory. This Court therefore rejects the gift theory as being unsupported by the record.
By a check dated August 15, 1979, KAPP paid $11,192.50 to the Ingrams as an installment payment on the house note (originally due February 15, 1979). Sarullo described this payment as a "loan" to his wife, by then the title owner of the house.
A check from MCC, dated February 11, 1981, and in the amount of $15,000.00, was used to pay another installment on the house to the Ingrams. Sarullo once again testified that this payment constituted a "loan" to his wife. Finally, by a check dated September 18, 1981, MCC paid Greenville Gravel Company (owned by Ingram) $8,212.00, the balance due on the house payments. Ingram testified that he personally received this payment. In summary, no payment of the balance due on the house and lot deed of trust was paid by Martha Carol Sarullo, individually.

D.
An argument can be made that, in spite of Clark's inability to show her good faith concerning the details of the transaction, there was likewise little testimony detailing her active participation in the fraudulent conveyance of the Lake Washington property. This argument has likewise been strongly refuted.
`Conveyances from one relative to another when attacked by the creditors of the grantor, will always be closely scrutinized, for from the very relation of the parties it is scarcely to be supposed that the circumstances and intention of the grantor were not known to the grantee.'
...
It is a presumption in such cases that the grantor's fraudulent intention is known and participated in by the grantee... .
Jones v. Beers, 118 Or. 317, 246 P. 711, 712 (1926) (citations omitted).
Even in cases where this strong presumption has not been followed, courts have adhered to the idea that certain knowledge may fairly be imputed to the grantee, in this case, Clark:
To be regarded as a participator in the fraud, it is not necessary that the purchaser have actual knowledge of the debtor's fraudulent intent, but merely a knowledge of facts and circumstances sufficient to excite the suspicions of a prudent man and be put on inquiry, or to lead a person of ordinary perception to infer fraud.
Alan Drey Company, Inc. v. Generation, Inc., 22 Ill. App.3d 611, 317 N.E.2d 673, 680 (1974).

*711 If the grantee has notice of facts putting him on inquiry as to the grantor's fraudulent intent, it is the same as if he too has the intent.
J.C. Jacobs Banking Co. v. Campbell, 406 So.2d 834, 847 (Ala. 1981) (citations omitted).
In light of this body of case law and the facts of this case, this Court concludes that Clark must be considered an active participant in the fraud perpetrated on the Bank. Her close relationship with Sarullo, in conjunction with the factors showing indicia of fraud present in this case, leads inescapably to the conclusion that she was at the very least chargeable with the knowledge of what her husband was attempting to do by conveying the property to her.
Having established that Clark was guilty of perpetrating an actual fraud on the bank, the next question then becomes, does such actual intent serve to terminate her right to reimbursement for any money expended on the Lake Washington property? The answer to this question is unquestionably "yes."
Support for this position is found in this Court's "seminal"[3] decision in Blount v. Blount, 231 Miss. 398, 95 So.2d 545 (1957):
Where the conveyance is founded in actual fraud the grantee is regarded as a particeps criminis, and is not entitled to reimbursement, or to have the conveyance stand for any purpose of reimbursement or indemnity, for the consideration paid... . If the grantee has been a conscious participant in the fraud, he is not, as against creditors, entitled to reimbursement for such expenditures... . Public policy forbids the reimbursement of a particeps criminis; otherwise one would hazard nothing by active participation in such unfair dealing.
95 So.2d at 560. (citations omitted). See also, Lynch v. Burt, 132 F. 417, 432 (8th Cir.1904).
This rule has also been stated thusly:
The correct doctrine must be in all such cases, where there is actual fraud, that the defrauded creditors are entitled to the full value of their debtor's property thus fraudulently conveyed, without regard to the loss that may fall upon those who have conspired to defeat them. This will also operate as a just punishment for the guilty, and deter men from participating in the perpetration of frauds upon honest creditors. If they are to be fully reimbursed upon detection in their fraud, there would be no restraint upon them. The heavier the loss upon them, the better will be the effect as an example, and the more the law will be exalted in the estimation of all good men. It would be but a mockery to allow men to enter into these fraudulent arrangements, and enjoy the chances of success, and when detected, saved from all loss by full reimbursement. This is not the policy of the law, nor is it law at all, in cases of actual fraud.
State v. Nashville Trust Co., 28 Tenn. App. 388, 190 S.W.2d 785, 798-99 (1944).
The facts of this case virtually mirror those found in Bank of Atkins v. Teague, 205 Ark. 38, 166 S.W.2d 1017 (1942). In that case, the husband had conveyed his 200-acre farm, a house, and some lots to his wife in an effort to defraud the creditor bank. The Supreme Court of Arkansas affirmed the trial court's decision that the conveyance was fraudulent as to the bank. Additionally, the Court reversed the lower court's decision to allow the wife a lien for the sums she had expended in "extinguishing the mortgage indebtedness against said lands ...," holding that the wife had been an active participant in the fraud perpetrated against the bank, and as a consequence, she "must be left in the snare her own devices have laid." 166 S.W.2d at 1018-19. The same reasoning is applicable here.
This Court concludes that the trial court erred in allowing reimbursement to M.C. Clark for any sums expended by her in paying off the mortgage on the Lake Washington home. Therefore, that portion of the chancellor's decision allowing the reimbursement should be reversed.

IV.

DID THE CHANCELLOR ERR WHEN HE FOUND THAT THE PAYMENT OF *712 THE SECOND MORTGAGE BY MRS. SARULLO'S TRUST FUND CONSTITUTED A GIFT TO APPELLEE M.C. CLARK?
As part of the chancellor's ruling, he found that the $10,000.00 paid on the second deed of trust was made "by or through" Mrs. Frances Sarullo as a "gift to her daughter-in-law." The Bank contends on appeal that this conclusion is wholly unsupported by the record and this Court agrees. We find no source for the chancellor's holding that the money constituted a gift to M.C. Clark. The facts detailing this conclusion have been previously outlined in Section (III)(C).
In numerous cases, this Court has held that before a chancellor's decision can be overturned, it must be shown that the chancellor was "manifestly in error" and that his decision was "against the overwhelming weight of the evidence." In re Estate of Harris, 539 So.2d 1040, 1043 (Miss. 1989); Conservatorship of Kendrick v. Hancock Bank, 537 So.2d 888, 890-91 (Miss. 1989); Shaw v. Ladner, 447 So.2d 1272, 1274 (Miss. 1984). This represents a formidable obstacle for an appellant to overcome, but in this case, the Bank has successfully met this burden. There is no evidence in the record to justify the trial court's decision on this particular point. This Court concludes that the chancellor's decision to allow Clark a reimbursement in the amount of $10,432.00 must be reversed.

V.

DID THE CHANCELLOR ERR WHEN HE REFUSED TO ALLOW THE ASSESSMENT OF PUNITIVE DAMAGES AGAINST IPS AND M.C. CLARK, INCLUDING ATTORNEY'S FEES?
Under the Bank's final assignment of error, they maintain that the chancellor erred when he refused to award punitive damages, including attorney's fees, to them. It should be noted initially that the Bank has already been awarded $2,000.00 in attorney's fees for the Florida judgment and $5,938.99 in fees for the Mississippi judgment.
As to punitive damages, the Bank correctly notes that in Tideway Oil Programs v. Serio, 431 So.2d 454, 459-467 (Miss. 1983), this Court stated that chancery courts were authorized to award punitive damages under the proper circumstances. Since then, this Court has in fact upheld the awarding of punitive damages by chancery courts. Central Bank of Mississippi v. Butler, 517 So.2d 507, 512 (Miss. 1987).
Tideway lists a variety of circumstances under which punitive damages could be properly awarded. These circumstances include "where the defendant has done to the plaintiff such a wrong as to import insult, fraud, oppression or reckless disregard for the rights of plaintiff," or "upon a showing of willful and intentional wrong, or for such gross negligence and reckless conduct as is equivalent to such a wrong." 431 So.2d at 465. The finding of a fraudulent conveyance justifies the imposition of punitive damages, but this Court elects not to reverse the chancellor on this point.

CONCLUSION
For the foregoing reasons, it is the opinion of this Court that the decision of the trial court be reversed concerning the reimbursement of approximately $44,000.00 to appellee Clark, but affirmed in all other respects.
AFFIRMED ON VOIDANCE OF FRAUDULENT CONVEYANCE; AFFIRMED ON ISSUANCE OF WRIT OF EXECUTION ON THE REAL ESTATE PURSUANT TO MISS. CODE ANN. § 13-3-113 ET SEQ; AFFIRMED ON APPLICATION OF PROCEEDS FIRST TO THE COSTS OF EXECUTION AND SALE AND TO SATISFACTION OF PLAINTIFF'S JUDGMENT, TOGETHER WITH ACCRUED INTEREST AND ATTORNEYS' FEES WITH ANY BALANCE PAID TO I.P. SARULLO ENTERPRISES, INC.; REVERSED AND RENDERED ON REIMBURSEMENT TO M.C. CLARK (MRS. S.F. SARULLO).
ROY NOBLE LEE, C.J., and ROBERTSON, ANDERSON, PITTMAN and BLASS, JJ., concur.
HAWKINS and DAN M. LEE, P.JJ., and SULLIVAN, J., concur in part and dissent in part.
*713 HAWKINS, Presiding Justice, concurring in part and dissenting in part:
I would affirm the chancery court decree. I concur with the majority that under well settled principles of law the conveyance to the wife, Clark, should be set aside.
I do not agree, however, that Clark should receive no benefit whatever for the amounts she paid on outstanding deeds of trust, liens superior to the mere creditor status of Southeast Bank, and which payments inured to the Bank's direct financial benefit.
Clark harmed the Bank in no way whatever in paying on these outstanding mortgages. Indeed this benefitted the Bank. The only way the Bank was hindered was in the conveyance from the insolvent corporation to Clark, not in reducing outstanding mortgages.
This is one of these close calls in which I think we should respect the chancellor's findings. A wife should not be penalized for trying to help her husband for an act which did not harm, but in fact benefitted his creditors.
DAN M. LEE, P.J., and SULLIVAN, J., join this opinion.
NOTES
[1] The record supports the fact that "M.C. Clark" is one and the same person as Martha Carol Clark Sarullo.
[2] The trial court emphasized the lack of comparable housing prices presented, the lack of personal knowledge of the property in 1978, and the potential bias of each party's expert witness.
[3] See, Barbee v. Pigott, 507 So.2d 77, 84 (Miss. 1987).