ROY NOBLE LEE, Chief Justice,
for the Court:
W. R. Rhoads and Evelyn Rhoads, his wife, filed suit in the Chancery Court of Alcorn County, Mississippi, to cancel a purported deed executed by them to J. Loyd Borden. Evelyn Rhoads appealed to this Court from an adverse judgment and presents three (3) issues for decision.[1]
ISSUES
I. DID THE LOWER COURT ERR IN FAILING TO SET THE DEED ASIDE?
II. DID THE LOWER COURT ERR IN SUSTAINING BORDEN’S MOTION TO QUASH SUBPOENA DUCES TE-CUM?
III. DID THE LOWER COURT ERR IN REFUSING TO ALLOW RHOADS TO CROSS-EXAMINE REGISTER REGARDING HIS ILLEGAL ACTIVITIES?
FACTS
The Rhoads hired J. Loyd Borden to fly their private planes. Although Borden’s principal employment was Station Manager for the Southern Railroad, he was a commercial pilot on the side. For approximately nine years, Borden flew the Rhoads, their friends, and associates back and forth between their Corinth, Mississippi residence and the Rhoads’ home in Perdido Beach, Alabama. He flew to other destinations as well and also maintained the airplane.
According to Borden, the Rhoads reimbursed him for all out-of-pocket expenses relating to the airplane and hotel expenses. The Rhoads did not, however, pay him a salary for his labor. Instead, Borden claims that the Rhoads agreed to give him the last airplane that he owned. According to the Rhoads, however, they had the same agreement with Borden that they had with all their previous pilots i.e., that he would have unlimited access to use the plane.
During the years that Borden flew for the Rhoads, the latter bought and traded several different planes. The Rhoads eventually sold their last airplane and told Borden that they did not intend to buy another one. According to Borden, he reminded *411 the Rhoads of their deal, and the Rhoads asked Borden if he would accept the Perdi-do Beach property in exchange for the airplane. Borden agreed.
Although there is some dispute as to whether the “airplane agreement” existed, it is clear that the Rhoads wanted to give Borden some of the Perdido Beach property. The Rhoads trusted Borden. He had keys to their homes, cars and their airplane; wrote checks on#their bank accounts for expenses related to the airplane; and also performed important business errands for them. The Rhoads claim that, at first, they only intended to give Borden one lot on which to build a cabin, but Borden complained that one lot was not large enough to comply with local regulations regarding the installation of a septic tank. Thus, the Rhoads decided to give him two lots.
The deed was executed on May 21, 1986. At the time of the execution, W. R. Rhoads was ill and unable to get around very well. W. R. Rhoads testified in his deposition that Borden brought the deed to him at his home in Corinth to get his signature.[2] Although W. R. Rhoads was unable to read the document, he signed it anyway and told Borden to get the notary public to call him and read the description back to him. Mrs. Rhoads also signed the deed.[3] Jack Holt, the Mayor of Corinth at the time, notarized the document, but did not call the Rhoads to see if they actually signed the document. The Rhoads, however,, do not deny that they signed the document, but they do claim that the document they signed was altered later.
Since the property was located in Alabama, the deed had to be recorded in Alabama. Borden was aware that, under Alabama law, the deed must have a scrivener’s endorsement on its face, indicating who had prepared it. The deed was recorded on September 4, 1986, but, prior to that, Borden had conveyed his interest in the property to Rena Martens.[4]
According to W. R. Rhoads, he executed a deed to Borden for only two lots. It came to his attention, however, that Borden claimed to own all twelve lots including the 3,000 square foot home. W. R. Rhoads got a copy of the deed on record in Alabama and discovered that the deed had been altered to include all of the Perdido Beach property. On January 9, 1987, the Rhoads filed this action in Chancery Court to have the deed set aside.
Borden denies having anything to do with the deed prior to its execution. He claims that the Rhoads had the deed drawn, and that it was given to him on the day that it was executed.
Borden filed an Answer and Cross-Complaint on June 13, 1988. The complaint sought recovery from the Rhoads for services rendered quantum meruit. Evelyn Rhoads filed a Motion to Dismiss Cross-Complaint on June 21, 1988. The motion to dismiss was granted on August 31, 1988.
A trial was held on March 28, 1989. At the end of the trial, the Chancellor stated that he was not going to give a bench opinion. Rhoads’ attorney had to file a Writ of Mandamus on November 7,1989, to obtain a decision by the Chancellor. On November 14, 1989, the Chancellor entered a three sentence order holding that Borden was the owner in fee simple of the land by virtue of the deed. Although requested by Rhoads, the Chancellor never made a detailed finding of fact and conclusions of law. Rhoads appeals from the Chancellor’s order to this Court.
LAW
I.
Evelyn Rhoads contends that the lower court erred in failing to set aside the deed *412 because it had been altered. Rhoads offered the expert testimony of Frank Hicks, an expert document examiner for the Mississippi Crime Laboratory in Jackson, Mississippi:
It was found that on line one, the “s” at the end of the word lots, and then the words at the end of the line through and the numeral seven were out of alignment with the remainder of the typewriting on that line. The same is true on line five of the “s” on the end of the word lots, and the word through and the numeral one and nine. This typewriting was not in proper alignment with the remainder of the typewriting proceeding it on that line. This means that it was not typed as part of one continuous typing action. Either this material was added after the typing of the document and movement of the paper in the typewriter, or the document was typed, the paper was removed completely, and reinserted at some other time and this material was added.
The fact that it is out of alignment is a result of the difficulty in reinserting a piece of paper into a typewriter in exactly the same position in which it had been originally. The loss of alignment is very obvious. When you look at the “s” at the end of both of the words lots where the “s” on one line, where the “s” on line one is crowded up against the “t” that precedes it, and then on line five, it is crowded up against the “t” and is too high. It was also found that the alignment of these two questioned entries agree between themselves, meaning they were typed as part of one continuous typing action, but they were not typed at the same time as the remainder of the typewriting in that area.
Deleting the purported altered language, the deed conveys only two lots. The Rhoads testified that they did not convey, nor was it their intention to convey, the entire property at Perdido Beach. Their testimony was corroborated by their two daughters and that of Travis Little.
The failure to record a conveyance, or unusual delay in recording it, ordinarily is a badge of fraud.
37 C.J.S. Fraudulent Conveyances § 85 (1943).
An excessive effort to clothe a transaction with an appearance of fairness is a badge of fraud.
37 C.J.S. Fraudulent Conveyances § 90 (1943).
On the other hand, however, it must not be overlooked that fraud arises by presumption from certain states of facts, when shown to exist, in cases: (1) of confidential relations; (2) where a trustee deals with himself; (3) where the consideration paid is shockingly inadequate; (4) where a person of weak mind is apparently imposed upon; (5) in unjust voluntary conveyances as against creditors, and (6) others within like principals ...
Griffith, Mississippi Chancery Practice § 589, p. 657 (1925).
The following facts support Rhoads’ allegations of fraud:
1. The deed was prepared on a form that is printed in Bay Minette, Alabama. At the time of the execution of the deed, W. R. Rhoads was gravely ill, and not able to get around easily. He would not have had access to such a form. Furthermore, James Mathis, Rhoads’ attorney, had represented Rhoads for over 20 years, and normally handled such transactions, and was available.
2. The scrivener’s endorsement alleging that it was prepared by Mr. Cook of the law firm of Lyons, Pipes and Cook, Mobile, Alabama, was forged. There is no evidence that Mr. Cook was ever contacted by either party about the deed. W. R. Rhoads further emphasized that this firm had never represented him.
3. The Rhoads’ names were misspelled. The deed referred to them as “Rhodes.” Borden’s unusual spelling of Loyd, which is usually spelled “Lloyd,” was spelled correctly. Rhoads also introduced another document prepared by Borden showing that he misspelled Rhoads’ name as it was misspelled in the deed in question.
4. The description of the land was scrambled so that the additions could be made at the end of the first and fifth lines. In the previous deed to Mrs. *413 Rhoads, the alterations would have been impossible. Rhoads contends that lawyers religiously follow prior descriptions in preparing deeds which indicates that the deed in question was prepared by a layman.
5. Rhoads provided more evidence that the deed was prepared by a layman. The deed states “To have and to hold to the said J. Loyd Borden and his heirs and assigns forever, And we do covenant with the said real property that it is seized in fee of the above described premises; ...” If a competent attorney had prepared the document, it would have read “To have and to hold to the said J. Loyd Borden and his heirs and assigns forever, And we do covenant with the said J. Loyd Borden that we are seized in fee of the above described premises; ...” The Rhoads testified that all their business affairs were handled by their local attorney, James Mathis, or their son-in-law who was an attorney in Panama City, Florida.
6. W. R. Rhoads testified that he did not type and that he did not own a typewriter. Borden admitted that he typed. When the deed was signed, Mr. Rhoads could barely see. He could not read a newspaper and had trouble distinguishing between his two granddaughters. The only way he could read was with the help of an intense light and large magnifying glass.
7. Several witnesses corroborated Rhoads’ claim that Borden was to only receive two lots.
8. The notary public did not see the Rhoads sign the deed, and he failed to speak with Mr, or Mrs. Rhoads to confirm their signatures or receive their acknowledgments. W. R. Rhoads testified that he could not see well enough to read the description when he signed the deed and asked that it be taken to a notary with instructions that the notary call him on the telephone, read the description and take his acknowledgment by phone. This procedure, however, was never carried out.
9. Borden reconveyed the property to Rena Martens, his brother’s live-in girlfriend, shortly after the deed to him was recorded. Rhoads claims that this was an attempt by Borden to vest title in a “bona fide purchaser” so that the subject deed could not effectively be voided. This transaction was obviously not an arms length transaction because Borden offered to reconvey the property to the Rhoads in the event that the court held the subject deed void.
10.The person who typed the deed stated the consideration as “$10.oo.” The typist used the lower case of the letter “o” after the decimal point instead of zeroes, “0’s.” Rhoads states that this is an unusual practice in typing dollars and cents. Several documents typed by Borden, however, were introduced in which the dollars and cents were typed the same as in the subject deed.
The record is not contradicted that for a period of nine years Borden was given keys to the homes of the Rhoads, and to their cars and airplanes. Borden was sent on business trips for the Rhoads and he was allowed to fill out checks on bank accounts for airplane expenses. We are of the opinion that there was a close, confidential and trust relationship between the Rhoads and Borden. Further, the evidence is not contradicted that the Rhoads neither prepared the deed nor had it prepared by an attorney. Borden claims he first saw it in the possession of the Rhoads immediately before it was executed.
Since there was a confidential relationship between the Rhoads and Borden, there is a presumption that the acts of Borden in obtaining the deed to the Rhoads’ property were suspicious and fraudulent and that the deed of conveyance is invalid. The burden then shifts to Borden to prove by clear and convincing evidence that no fraud was involved, that there was no undue influence on his part, that there was an arms length transaction and that the deed was valid. Miner v. Bertasi, 530 So.2d 168, 171 (Miss.1988); Estate of McRae, 522 So.2d 731, 737-40 (Miss. 1988); Mullins v. Ratcliff, 515 So.2d 1183, 1192-94 (Miss.1987); Murray v. Laird, 446 *414 So.2d 575, 578 (Miss.1984); Hendricks v. James, 421 So.2d 1031, 1043 (Miss.1982); Mansell v. Gross, 345 So.2d 1315, 1317 (Miss.1977); In re Will of Moses, 227 So.2d 829, 834 (Miss.1969); Wofford v. Wofford, 244 Miss. 442, 459-61, 142 So.2d 188, 195-96 (1962); Croft v. Adler, 237 Miss. 713, 724-27, 115 So.2d 683, 686-88 (1959); Ham v. Ham, 146 Miss. 161, 110 So. 583, 584-85 (1926); Meek v. Perry, 36 Miss. 190, 251-52 (1858).
Borden states that a handwritten memorandum of the transaction was prepared prior to the typed deed of conveyance. However, the same claim and position of Rhoads applies to it and the proof is stronger on her position. Borden admits he wrote the memorandum in his own handwriting. The same failures and faults appear in, and apply to, that memorandum as to the deed itself.
We are of the opinion that Borden failed to meet the burden imposed upon him by the confidential relationship and trust to overcome the presumption of fraud and that the deed of conveyance was void, and we are of the opinion that the chancellor erred in upholding the deed.
II. and III.
In view of the Court’s decision on issue number one, we do not find it necessary to discuss issues two and three.
Having resolved issue number one in favor of Rhoads, the judgment of the lower court is reversed and judgment is rendered in favor of Rhoads.
REVERSED AND RENDERED.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.

. W. R. Rhoads departed this life shortly before trial. The title to the disputed property was vested in Evelyn Rhoads at the time of the disputed deed and this appeal was taken in her name alone.

. W. R. Rhoads was terminally ill when the complaint was filed. He died before the case went to trial and his video-taped deposition was read into the record at trial.

. The property in question was actually in Evelyn Rhoads’ name. W. R. Rhoads only signed the deed to clear up any doubts.

. According to the appellant's brief, Borden's brother married Martens in Costa Rica on August 10, 1984, in a proceeding which was not valid in the United States.