# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00035-COA

**CURTIS DEAN LOFTON SR.**                                      **APPELLANT**

**v.**

**SHARON RENAE LOFTON AND PENTAGON**                **APPELLEES**
**FEDERAL CREDIT UNION**

DATE OF JUDGMENT:            08/04/2020
TRIAL JUDGE:                 HON. JAYE A. BRADLEY
COURT FROM WHICH APPEALED:   LINCOLN COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:     ROBERT S. ADDISON
                             MATTHEW THOMPSON
ATTORNEYS FOR APPELLEES:     W. BRADY KELLEMS
                             BETH WINDSOR BURTON
NATURE OF THE CASE:          CIVIL - REAL PROPERTY
DISPOSITION:                 AFFIRMED - 02/07/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., SMITH AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Sharon Renae Lofton (Renae) filed a complaint for divorce against her husband, Curtis Dean Lofton Sr. (Dean), in April 2018. The divorce action is pending. About a year later, Renae filed a separate lawsuit in the Lincoln County Chancery Court against her husband and the parties' adult son, Curtis Dean Lofton Jr. (Curtis), to set aside certain allegedly fraudulent transfers of real and personal property. The fraudulent-transfer lawsuit was tried before a chancellor in 2020. This appeal is from the chancery court's judgment in Renae's favor in that lawsuit.

¶2.     With the exception of a homestead conveyance,[1] the chancery court found that the

transfers were fraudulent under the Uniform Fraudulent Transfer Act (UFTA), Mississippi

Code Annotated sections 15-3-101 to -121 (Rev. 2012), and Mississippi caselaw.  The

chancery court set aside these transfers and ordered that the property be held in trust until

Renae and Dean's ownership interests were adjudicated in the separate divorce proceeding.

The chancery court further ordered that certain payments relating to the real or personal

property be paid into the registry of the Lincoln County Chancery Court.  Additionally, the

chancery court awarded attorney's fees to Renae.

¶3.     Dean appealed, and we have consolidated his issues for clarity.  Dean asserts that the

chancery court erred when it (1) concluded that the UFTA supported a finding of fraud and

relied on caselaw that was distinguishable from the case before it and (2) failed to undergo

a *McKee*[2] analysis in awarding attorney's fees to Renae. Finding no abuse of discretion or

manifest error, we affirm the chancery court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶4.     Renae and Dean were married on May 26, 1996.  Curtis is their son and the only child

born of this marriage.  The parties lived in the home located at 2507 Dalton Lane in

Smithdale, Mississippi, and declared a homestead exemption on this property (the homestead

---

[1] The chancery court found that the conveyance of the homestead property was void, not because it was a fraudulent transfer, but because it was a conveyance of a marital homestead without the signature of both spouses.  Dean does not raise any issue on appeal relating to this portion of the chancery court's judgment.

[2] *McKee v. McKee*, 418 So. 2d 764 (Miss. 1982).

property).  Dean owned the home and lived there before he married Renae.

¶5.     Renae filed a complaint for divorce against Dean on April 23, 2018.  On that same date, she also filed a lis pendens notice in the Lincoln County Chancery Clerk's office, listing numerous properties located in Lincoln County and attaching copies of the deeds relating to the affected properties.

¶6.     On July 9, 2019, Renae initiated her fraudulent-transfer lawsuit against Dean and Curtis. She sought to set aside the quitclaim deed conveying the homestead property from Dean to Curtis, as well as ten other quitclaim deeds from Dean to Curtis that were "purportedly dated and notarized on February 9, 2018, but were not recorded until April 27, 2018."  Renae also sought to set aside a document titled "Transfer of Ownership" that transferred ownership of certain personal property that included mobile homes, vehicles, guns, and farm equipment from Dean to Curtis.  Like the ten quitclaim deeds, the transfer-of-ownership instrument was purportedly dated and notarized on February 9, 2018, and recorded on April 27, 2018.  In her complaint, Renae also described certain payments and insurance proceeds that had been collected by Dean or Curtis relating to the land and personal property transferred to Curtis.  Renae also sought reasonable attorney's fees and costs.

¶7.     Renae subsequently filed an amended complaint, joining Pentagon Federal Credit Union (PenFed) as a necessary party because it was the holder of a note and deed of trust

3

related to the homestead property.[3]

¶8.　　To be clear, we reiterate that Dean does not raise any issue on appeal relating to that portion of the chancery court's judgment setting aside the homestead-property conveyance because Dean did not obtain Renae's signature on this deed (in violation of the nonwaivable statutory requirement that both spouses sign a conveyance of homestead property).[4] Rather, at issue in this appeal is the part of the chancery court's judgment that (1) sets aside the ten other quitclaim deeds and the transfer-of-ownership instrument; (2) requires certain payments to Curtis or Dean relating to this real and personal property be paid into the registry of the Lincoln County Chancery Court; and (3) awards attorney's fees to Renae.

¶9.　　Renae sought to consolidate the divorce case and fraudulent-transfer case.　Dean

---

[3] We observe that although PenFed is named as an appellee, PenFed has recognized in its appellee's brief that no issues on appeal are related to PenFed's interest, which relates solely to the homestead property.

[4] In particular, the quitclaim deed conveying the homestead property was signed only by Dean and was dated and notarized on December 1, 2017, prior to Renae and Dean's separation when Renae left the marital home on April 9, 2018. The chancery court found "that this quitclaim deed [in which Dean] conveyed the marital homestead to [Curtis] without obtaining Renae's signature [was] void." The court observed, "Mississippi case law holds that any conveyance of a homestead is void without the signature of both spouses[,]" citing *Ward v. Ward*, 517 So. 2d 571, 573 (Miss. 1987) (quoting *Hughes v. Hahn*, 209 Miss. 293, 298, 46 So. 2d 587, 589 (1950)). *See* Miss. Code Ann. § 89-1-29 (Rev. 2011) ("A conveyance . . . upon a homestead exempted from execution shall not be valid or binding unless signed by the spouse of the owner if the owner is married and living with the spouse."); *see also In re Jones*, 138 So. 3d 205, 211 (¶¶21-22) (Miss. Ct. App. 2014) (recognizing that a quitclaim deed in which the husband attempted to convey homestead property was invalid, finding that "[b]ecause the home was exempted as a homestead, and because [the wife] resided in the home with [the husband], [the wife's] signature was required to convey the property," and "the statutory requirement cannot be waived").

4

objected to consolidation. The cases were tried separately. The fraudulent transfer case was tried over five days in 2020.

¶10. Renae testified that she left Dean on April 9, 2018, and filed her complaint for divorce on April 23, 2018. She testified that she knew about the quitclaim deed conveying the marital property to Curtis, and she also understood that someday, once they (she and Dean) passed away, the other properties would pass to their children. But she did not know anything about the ten quitclaim deeds purportedly executed by Dean on February 9, 2018, that conveyed the various other Lincoln County properties to Curtis, nor did she know anything about the transfer-of-ownership instrument transferring the personal property to Curtis that Dean also purportedly executed on February 9. When she was questioned about the properties referenced in the lis pendens notice she had filed the same day as her complaint for divorce, Renae testified that she and her lawyer "froze the assets just to be careful. I didn't know [Dean] had given everything to [Curtis.]" Renae testified that it was not until after she had filed her complaint for divorce that she discovered the quitclaim deeds and the transfer-of-ownership instrument. The documents showed that they had been recorded in the Lincoln County Chancery Court's land records on April 27, 2018, four days after she filed her divorce complaint.

¶11. Renae acknowledged during cross-examination that she and Dean were having marital problems before February 2018, but she had not threatened him with a divorce lawsuit. She also testified, however, that when she told Dean she would never leave him, "he said [that]

5

our son would be graduating, and . . . that I could leave if I wanted to. . . . [Curtis] would be out of the house, I could leave if I wanted to, because I wasn't happy."

¶12.    Renae's counsel offered into evidence his attorney's fees affidavit and supporting time sheets prepared pursuant to the requirements of *McKee v. McKee*, 418 So. 2d 764 (Miss. 1982). Dean's counsel objected with respect to certain entries, and Renae's counsel responded to these objections. The chancellor court allowed the exhibit to be admitted into evidence, noting the caselaw that allows for attorney's fees in fraudulent-conveyance cases. The chancellor also told Dean's counsel that she could cross-examine Renae's counsel on his charges during Dean's case-in-chief. The record reflects that Dean's counsel did not do so.

¶13.    Gary Cupit testified for Renae. He and Dean had been "real good friends." In late 2017 and early 2018, Dean made some statements to him that stuck in his mind. According to Gary, Dean "made comments that he was fixing to get rid of some of them sorry MFers, and she was included; Renae Lofton was included, and he was on a mission." Gary said that Dean told him that "he was just going to get rid of her, Renae, and give his property to the kids where she couldn't have it."

¶14.    Renae called Curtis as a witness during her case-in-chief. Curtis testified that his father had prepared all the quitclaim deeds and the transfer-of-ownership instrument. Curtis confirmed that he did not pay anybody or give anything in exchange for the real and personal property that his father conveyed to him. He also testified that although property located at

6

2265 West Lincoln Drive was conveyed to him in one of the quitclaim deeds from his father, his father remained listed as the insured on that property, and his father paid for the insurance, as reflected in the Alfa Insurance documents admitted into evidence listing "Curtis Dean Lofton, Sr." as the insured. Curtis also testified that his father lived on the property in the shop or "man cave" adjacent to the "big house" on the property. Additionally, Curtis acknowledged that vehicles transferred to him in the "transfer of ownership" instrument remained insured by his father, which was also reflected in the Alfa insurance documents.

¶15. Curtis testified about a document dated February 9, 2018, titled "LEGAL DOCUMENTATION Statement prepared by Curtis Dean Lofton Jr." He acknowledged that his father had required that he sign it before his father would sign the quitclaim deeds to the ten properties and the transfer-of-ownership instrument. The document provides, among other things, "that at any point in time I am deemed unfit by CURTIS DEAN LOFTON SR, [Dean and Taylor Holden (Dean's daughter by another marriage)] . . . will receive their portions of the properties and assets." Matt Dees also testified at trial. He signed Curtis's statement as a witness. He admitted that he had no personal knowledge whether Renae ever saw the statement.

¶16. During his testimony, Curtis also acknowledged that his father (Dean) was the insured for a barn and certain equipment that had been transferred to Curtis and subsequently had been lost or damaged in a fire, as reflected in the Mississippi Farm Bureau Casualty Insurance Co. (MFBCIC) documents that were admitted into evidence. The record reflects

7

that in August 2018, Dean was compensated for the loss of the barn in the amount of $62,650.00 from MFBCIC and $46,759.33 from Ohio Indemnity Company for the loss of equipment in the barn. Curtis testified that he received the insurance proceeds and deposited them into his account at Ferguson Federal Credit Union. Curtis was also questioned about his father's tax returns that were admitted into evidence. Curtis confirmed that certain equipment that his father had transferred to him was listed on Dean's tax returns for 2018.

¶17. Curtis further testified that his father obtained additional funds through an equity line of credit his father previously had taken out on the homestead property and used these funds to purchase a camp in Louisiana for cash. The cash deed was admitted as an exhibit at trial and reflects that the camp was titled solely in Curtis's name and that the transaction occurred on April 17, 2018 (shortly after Renae and Dean separated on April 9). Curtis said that his father gave him the money to pay for the camp; later they would trade properties so that his father would get the camp, and Curtis would get the homestead property. According to Curtis, he and his father and mother had talked about this plan before his parents separated.[5] Curtis testified that although the equity line of credit was still in his father's name, Curtis has been paying on the loan. The record reflects that as of 2020 (when the case was tried), both the camp and the homestead property were titled in Curtis's name, and Dean lived in the shop/man cave on the 2265 West Lincoln Drive property (one of the ten properties Dean

_____

[5] Renae, however, testified that although she knew Dean was looking for a fishing camp before their separation, she did not know of the Louisiana camp purchase, and she was not aware of the loan further encumbering the homestead property.

8

conveyed to Curtis).

¶18.    Curtis also testified during his case-in-chief. He said that the ten quitclaim deeds and the transfer-of-ownership instrument were signed and notarized by Lacy Powe at McCall Creek Grocery in early February 2018. He and his father were at the grocery store when his father signed the documents. His mother was not there, but according to Curtis, she knew that they were going to get the deeds signed. Curtis testified, "I believe we all spoke about it, me and my sister and Dad and her." Curtis further testified that "at some point in February," he and his father went together to the courthouse to file the quitclaim deeds and the personal property transfer-of-ownership instrument. Curtis later testified, however, that he could not be sure about this time frame because from February through April he was "offshore three times to New York and on a cruise."

¶19.    Sheila Killingsworth, a land records deputy clerk at the Lincoln County Chancery Clerk's office, also testified during Renae's case-in-chief. Killingsworth testified that in her nineteen years of experience as a land records deputy clerk, deeds had never been held for two months before they were filed. She explained that typically, if a deed is brought in one morning, it is filed that day and sent back, unless the clerk's office did not have time to get it filed. If so, the deed was put in a safe and filed the next day, but all documents were time-stamped on the day they were received. She was shown the ten quitclaim deeds and the transfer-of-ownership instrument and confirmed they were all recorded on April 27, 2018. Killingsworth acknowledged during cross-examination that it may not be uncommon for a

9

deed to be signed and not immediately recorded.

¶20.    Renae rested.  Dean moved to dismiss Renae's lawsuit, asserting Renae had put forth

insufficient proof of fraud.  The chancery court denied Dean's motion.

¶21.    Dean testified during his case-in-chief.   He confirmed that he lived in the shop/man

cave on the West Lincoln Drive property that he had conveyed to Curtis.   He likewise

confirmed that he prepared all the quitclaim deeds and the transfer-of-ownership instrument.

He said that Renae knew about these documents. According to Dean, Renae had always said

that it was his land and that she did not want anything.[6]

¶22.    Dean testified that after he had signed the ten quitclaim deeds and the transfer-of-

ownership instrument in February 2018, he kept them at his home.  According to Dean, when

Renae left during the second week of April, he took the deeds to the courthouse.  He testified

that Renae left on April 8, and he "took them up there that following day or two. I know that

for sure. I asked the lady to do them that day. She said we cannot do them. I think I paid her

a sum of 112, $115 [sic].  And she said, we'll mail them to you."

¶23.    Regarding the state of his marriage, Dean testified that there were no marital problems

that he knew of at the time the deeds and transfer instrument were signed in February.  He

said that he did not know Renae was "about to file for divorce" "because we was all

_____

[6] Several other witnesses testified at trial that Renae knew about the homestead
conveyance.  No one could testify, however, that he or she had personal knowledge whether
Renae knew about the ten other quitclaim deeds or the transfer-of-ownership instrument that
Dean executed in Curtis's favor.

together." But during additional questioning, Dean testified about some of Renae's conduct that gave him reason to believe she was filing for divorce. He said that in 2012 "she had moved [to] the back bedroom;" sometime between 2012 and 2014, she had filed a lawsuit, and he was not included as a plaintiff. He further testified that Renae "got the money" from the lawsuit "and bought a Mercedes Benz and stuff." He said, "[W]hen I done got to looking, she had it tagged at another address. And then I got to thinking, and the next thing I know I get some divorce papers." He continued, "She had got her lawsuit and put it in an account. My name was not on the account or anything."

¶24. Dean was questioned about the insurance policies on some of the real and personal property conveyed to Curtis. Dean confirmed that he remained listed as the insured on the 2265 West Lincoln Drive property and that he paid the insurance premiums. Likewise, he confirmed that he was the insured and continued to pay the premium on the insurance covering certain trucks and other equipment that he had transferred to Curtis.

¶25. Additionally, Dean confirmed that he was the insured on the policy covering a barn and certain equipment that had been transferred to Curtis that was later lost or damaged in a fire in the summer of 2018. He received the insurance proceeds in the amounts reflected on the checks admitted into evidence, and he gave the proceeds to Curtis. Dean further testified that in September 2018, he had received a check in the amount of $19,688.00 from Entergy for a right-of-way on property that Dean had conveyed to Curtis. He gave the money to Curtis.

¶26. Dean also testified about the Louisiana fishing camp purchase, confirming that he had obtained additional funds on the equity line of credit secured by the homestead property, and on April 17, 2018, he bought the Louisiana property for cash. The deed was in Curtis's name. Dean testified that he continued to pay on the loan after the purchase, but in the "last seven, eight, nine months maybe," Curtis had been making the payments.

¶27. Lacy Powe was the notary public who notarized the ten quitclaim deeds and the transfer-of-ownership instrument. She testified that she notarized the documents at her store in McCall Creek in Franklin County, Mississippi. Her son and Curtis were friends. The quitclaim deeds and the transfer-of-ownership instrument were dated February 9, 2018, but they were not recorded until April 27, 2018, four days after Renae filed her divorce complaint. Powe confirmed that it was her signature as the notary for each document. During direct examination, she said that it was also her handwriting where the dates had been filled in on each document. She admitted, however, that she had no independent recollection of when the documents were signed. She could not produce a logbook to verify the date when she notarized the documents[7] because that logbook had been destroyed by a flood in her office. Powe also acknowledged that she told Renae's private investigator that the documents could have had blank dates when she notarized them. She also admitted during cross-examination that although the documents provided that they were executed in Lincoln

---

[7] Mississippi Code Annotated section 25-33-5 (Rev. 2018) (repealed effective July 1, 2021), was in effect at the time the documents were purportedly notarized and at the time of trial and required that a notary maintain a "register of all his official acts."

County, Mississippi, they were actually executed at her store in Franklin County, Mississippi.

¶28. The defense rested. Renae testified in rebuttal that she incurred additional attorney fees since the trial had begun. She reviewed her counsel's itemized statement for the additional attorney's fees. The statement was entered into evidence.

¶29. The trial concluded on July 13, 2020. On July 17, 2020, the chancellor issued her detailed findings of fact and conclusions of law. The chancellor's findings are addressed below. The chancery court's final judgment was entered on August 4, 2020. With respect to the issues on appeal, the chancery court held:

> [T]he Court finds, adjudicates and decrees that the deed transfers and transfer of personal property, as reflected in Exhibits #17-25, #41-A [(the 10 quitclaim deeds)] and #6 [(the transfer-of-ownership instrument)] were intended to defraud Renae Lofton, that the evidence established a strong presumption of fraudulent intent on the part of Curtis Dean Lofton, Sr. and Curtis Dean Lofton, Jr., which was not rebutted.

Based upon this finding, the chancery court set aside the ten deeds at issue and declared that they were "null and void." Likewise, the chancery court held that "[t]he purported transfer of personal property in the document titled 'Transfer of Ownership'. . . is set aside and said transfers are declared null and void."

¶30. Pursuant to the chancery court's final judgment, Curtis was divested of his ownership interests in the real and personal property relating to these transfers. The chancery court further ordered that Dean's ownership interests in this real and personal property "is to be held in trust until the divorce matter (Lincoln Co. Chancery Court cause #2018-204) is heard and the ownership interests of Sharon Renae Lofton and Curtis Dean Lofton, Sr., are

13

adjudicated." The chancery court also ordered that Curtis was "divested of his ownership interests in funds paid to Curtis Dean Lofton by [MFBCIC] in the amount of $62,650.00[,] . . . Ohio Fidelity . . . Company in the amount of $46,759.33[,] . . . and Entergy in the amount of $19,688.00." These funds "are to be paid into the registry of the Lincoln County Chancery Court at the Lincoln County Chancery Clerk's Office" to be held "until the ownership interests of Curtis Dean Lofton, Sr. and Sharon Renae Lofton are adjudicated in the divorce action."

¶31. Lastly, the chancery court ordered:

> Attorney's fees are awarded in the amount of $31,917.60 (Exhibit #61). A judgment for this amount is awarded to Renae against co-Defendants, [Dean] and [Curtis]. Both defendants . . . are jointly and severally liable for payment of said judgment within thirty (30) days of the Final Judgment to be entered in this case.

¶32. Dean's motion for a new trial or amendment of judgment was denied on December 9, 2020. Dean appealed.

## STANDARD OF REVIEW

¶33. "This Court will not disturb the findings of a chancellor when supported by substantial credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Van Cleave v. Est. of Fairchild*, 950 So. 2d 1047, 1051 (¶12) (Miss. Ct. App. 2007). "A chancellor's conclusions of law are reviewed de novo." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009).

## DISCUSSION

14

## I.    The Uniform Fraudulent Transfer Act (UFTA)

¶34.   Dean asserts that the chancellor erred in determining that the UFTA supported a finding of fraud because the chancellor did not "complet[e] an analysis [of the UFTA's] applicability."[8]  We find that this assertion is without merit.

¶35.   Mississippi's UFTA applies to complaints to set aside conveyances in fraud of creditors.  Section 15-3-107(1) provides that "[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . , if the debtor made the transfer . . . with actual intent to hinder, delay or defraud any creditor or debtor."

¶36.   Dean asserts that the chancery court wrongly treated Renae as a "creditor" under the UFTA because it did not find that she had a "claim" against him.  Dean's assertions ignore the plain language of the UFTA and the record in this case.

¶37.   Section 15-3-101(c) defines "claim" as "a right to payment, whether or not the right

---

[8] In the "Summary of the Argument" portion of his brief, Dean asserts that "[t]he [c]ourt, in allowing two separate actions to be maintained[,] committed manifest error, as all issues overlapped in both cases, including the parties, witnesses, documents, evidence and testimony."  But the record reflects that *Renae* moved to consolidate the two lawsuits, and *Dean* opposed consolidation.  The lawsuits were tried separately.  Dean did not object.  He failed to preserve any such objection before the chancery court.  The issue is therefore waived on appeal.  *Bay Point Props. Inc. v. Miss. Transp. Comm'n*, 201 So. 3d 1046, 1055 (¶18) (Miss. 2016) ("We do not hold trial courts in error on issues not presented to them for consideration.").  In any event, Dean does not list this issue as an issue on appeal, as required by Mississippi Rule of Appellate Procedure 28(a)(3), nor does he offer any other argument or supporting authority for this proposition, as required by Rule 28(a)(7).  It is waived for these additional reasons.

15

is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." A "creditor" is defined as "a person who has a claim." Miss. Code Ann. § 15-3-101(d). In this case, Renae filed a separate divorce complaint on April 23, 2018, requesting equitable distribution, alimony, attorney's fees and other relief. On the same day, Renae filed the lis pendens notice identifying the parties to the divorce action and providing that "[t]he nature of the suit will be against certain property for equitable distribution in connection with a pending divorce in Cause Number 2018-0204, Lincoln County Chancery Court." The notice then described the affected properties. Warranty deeds describing those properties were attached to the lis pendens notice. Renae plainly had a "claim" against Dean. Thus, by definition, she was his "creditor." Miss. Code Ann. § 15-3-101(d).

¶38. As the Mississippi Supreme Court recognized in *Blount v. Blount*, 231 Miss. 398, 413-14, 95 So. 2d 545, 552 (1957), "[a] wife, in respect of her right to maintenance or alimony, is within the protection of statutes or the rule avoiding conveyances or transfers in fraud of creditors." The supreme court held that "this is so irrespective of whether the conveyance or transfer was made before, and in anticipation of the wife's suit for maintenance or alimony, or pending the suit, or after a decree has been made in the wife's favor." *Id.* at 414, 95 So. 2d at 552; *accord West v. West*, 891 So. 2d 203, 217 (¶44) (Miss. 2004).

¶39. Dean asserts, however, that evidence he presented at trial showed he owned the properties at issue outright and had "largely acquired [these properties] before marriage" or

16

by gift or inheritance. But these are issues to be resolved in the separate divorce action. And, as noted above, Dean objected to consolidation of the two lawsuits. With respect to the fraudulent-transfer action before the Court, we simply point out that pursuant to section 15-3-101(c), a claim may be "disputed" and still constitute a "claim" under the UFTA—and it may "ar[i]se before or after the transfer was made." Miss. Code Ann. § 15-3-107(1). We further note that the chancery court recognized and provided for the disputed nature of these properties in its final judgment, requiring that Dean's ownership interests in the subject real and personal property be held in trust until the parties' divorce matter "is heard and the ownership interests of Sharon Renae Lofton and Curtis Dean Lofton Sr. are adjudicated." For these reasons, we find that Dean assertions on this point are without merit.[9]

¶40. Dean also asserts that his actions did not constitute "fraud" under the UFTA. The UFTA sets forth a non-exhaustive list of fourteen factors that a court may use to determine whether a transfer was made with "actual intent to hinder, delay or defraud." Miss. Code Ann. § 15-3-107(1). Relevant to the case before us, these factors include:

(a) The transfer . . . was to an insider;

(b) The debtor retained possession or control of the property transferred after the transfer;

---

[9] We note that Dean also asserts that the chancery court erred in citing *Carroll v. Carroll*, 78 So. 3d 332 (Miss. Ct. App. 2010), and *Myers v. Myers*, 741 So. 2d 274 (Miss. Ct. App. 1998), in its judgment. According to Dean, the court erred in doing so because these cases are divorce cases involving marital property and are thus distinguishable. For the reasons addressed above, we find this assertion unpersuasive and further find that several principles recognized in these cases and other similar cases are applicable here.

17

(c) The transfer . . . was disclosed or concealed;

(d) Before the transfer was made . . . , the debtor had been sued or threatened with suit;

(e) The transfer was of substantially all the debtor's assets;

(f) The debtor absconded;

(g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . . ;

(i) The debtor was insolvent or became insolvent shortly after the transfer was made . . . ;

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred;

. . . .

(m) A transfer made . . . by a debtor may be fraudulent to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer . . . .

Miss. Code Ann. § 15-3-107(2). These factors are similar to the "badges of fraud" recognized in cases decided before the UFTA went into effect in 2006. *Carroll v. Carroll*, 78 So. 3d 332, 336 (¶12) (Miss. Ct. App. 2010).

¶41.   Additionally, section 15-3-107(3) provides that a "strong presumption of fraud[,] which can be rebutted only by clear and convincing evidence[,]" arises "if there exists a combination of facts such as described in subsections (2)(l), (m) or (n) only." Miss. Code

18

Ann. § 15-3-107(3).

¶42. The chancery court addressed a number of the factors listed in section 15-3-107(2). We turn now to a discussion of those factors.

### 1. The transfer was to an insider.

¶43. The chancellor found, and the record reflects, that Dean transferred his ownership interests in real and personal property to his son, Curtis—an "insider." Miss. Code Ann. § 15-3-101(g)(i)(1) (defining an "insider" as "[a] relative of the debtor").

### 2. The debtor retained possession or control of the property transferred after the transfer.

¶44. The chancellor also found that Dean retained possession and control of the property, describing the testimony and evidence supporting this finding: "[Dean] lived on the property located at 2265 West Lincoln Dr. in the 'shop/man cave.'" He "continued to claim depreciation of personal property, purportedly conveyed to [Curtis] in the transfer[-of-ownership] instrument . . . on his 2018 tax return." "[Dean] also continued to insure the personal property and made claims on two [insurance] policies . . . when a fire destroyed a hay barn and some farming equipment." As the record reflects, a $62,650.00 claim was paid to Dean by MFBCIC, and a second $46,759.33 claim was paid by Ohio Indemnity Company. Dean also received a check in the amount of $19,688.00 from Entergy for a right-of-way on property that Dean had conveyed to Curtis. Additionally, the chancellor found that Dean "continued to use the property as if the transfers had not occurred, including borrowing money on a line of credit to purchase recreational property." The chancellor also found

19

relevant that Dean had Curtis execute the "Legal Documentation" statement that "transfers ownership of all the assets in dispute in this litigation back to [Dean] and Taylor Holden ([Dean's] daughter and [Curtis's] half-sister)" in the event of Curtis's death or "incapacitat[ion]." As the chancellor observed in her findings of fact, "[t]his document gives [Dean] the discretion to claim [Curtis] 'unfit' and reclaim ownership of the disputed property at any time."

### 3. The transfer and conveyances were concealed.

¶45. The chancellor found, and the record supports, that the transactions at issue "were concealed by [Dean] and [Curtis][.] Renae was not informed by her husband or her son[] about the conveyances of real property or the transfer of ownership in the personal property." The quitclaim deeds and the personal property transfer-of-ownership instrument were dated February 9, 2018, but "were not recorded or filed with the Chancery Clerk's office until after Renae filed for divorce." The chancellor found that although Dean testified that he took the deeds to the clerk's office to be recorded a "day or two" after Renae left on April 8, "the testimony from a senior deputy clerk regarding the office's practice and procedures on recording documents soundly rebutted [Dean's] testimony."[10]

¶46. Dean and Curtis testified that Renae knew about these conveyances and transfers and the chancellor found that "Dean testified that he wanted to keep the land in the Lofton family

---

[10] As set forth above, Killingsworth, a land records deputy clerk in the Lincoln County Chancery Clerk's office, testified that even if a deed could not be recorded the same day, it was always time-stamped the same day and recorded, at the latest, by the next day.

and Renae had always agreed to that." The chancellor further found, however, that "there was not clear and convincing evidence to establish [Renae's] knowledge and consent to the [subject] transactions . . . [, and] therefore the strong presumption of fraudulent intent on the part of [Dean] and [Curtis] was not rebutted."

### 4. Before the transfer was made, the debtor had been sued or threatened with suit.

¶47. On this factor, the chancellor found that

[a]pproximately four . . . days prior to the recording of the quitclaim deeds and transfer document in the land records of Lincoln County, Renae filed her lawsuit for divorce from [Dean]. The transfer of personal property and the conveyances of real property by [Dean] were an attempt to keep the marital assets along with [Dean's] personal estate from the Court's consideration in the pending divorce action.

The chancellor recognized that the conveyances and transfer-of-ownership instrument were "purportedly executed on February 9, 2018 and notarized by Lacy Powe." But the chancellor also found that Ms. Powe testified that "[her] son and [Curtis] are friends," and the chancellor further observed that "Powe[] testified at trial but had no independent recollection of the date and could not produce a log to verify the date on which she notarized these documents." At the time the documents were notarized, "[t]he State of Mississippi require[d] notaries to keep a log of such transactions. [Miss. Code Ann. §] 25-33-5. Without a log to verify the date the documents were signed, the court questions the reliability of . . . Powe's memory." In our own review of the record, we also noted that Powe acknowledged during cross-examination that she told Renae's private investigator that the documents could have

21

had blank dates when she notarized them. Also relating to Powe's credibility with respect to what occurred the day the documents were signed, Powe testified during direct examination that the documents were executed at her store in Franklin County. During cross-examination, however, counsel pointed out to her that the acknowledgments indicated the documents were signed in "Lincoln County." Powe said, "I didn't even know that that was there."

¶48. Dean asserts that the quitclaim deeds and the transfer-of-ownership instrument were executed on February 9, 2018, and were delivered and accepted on that date. He further asserts that "multiple witnesses testified that Renae knew about and was in agreement with transferring property to Curtis." The testimony Dean cites in support of this assertion, however, is the testimony of Matt Dees, who said that Renae knew about the "Legal Documentation" in which Curtis promised to return to his father and Taylor any property conveyed to him should he become "incapacitated" or declared "unfit" by his father. But Dees admitted on cross-examination that he did not have personal knowledge whether Renae ever saw that statement. Further, our own review of the testimonies of witnesses other than Dean and Curtis shows that although several of these witnesses testified that Renae knew about the homestead conveyance (a fact Renae does not deny and that is not at issue here), none of these witnesses could testify that he or she had personal knowledge whether Renae knew about the ten other quitclaim deeds or the transfer-of-ownership instrument that Dean executed in Curtis's favor.

22

### 5. The transfer included substantially all the debtor's assets.

¶49. On this factor, the chancellor found that the transfer of the assets at issue was "a large part of the marital estate and of [Dean's] personal estate" based upon Dean's financial declarations that were admitted as exhibits at trial.

### 6. The debtor absconded.

¶50. The chancellor found that Dean did not abscond.

### 7. The debtor removed or concealed assets.

¶51. The chancellor found that "[t]he transfer and conveyances of ownership of the assets in question is a blatant attempt to remove them from the consideration of the divorce court."

### 8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred.

¶52. At trial, Curtis confirmed that he did not pay anybody or give anything in exchange for the real and personal property that his father conveyed to him. Accordingly, the chancellor found that "[Curtis] did not give any consideration to [Dean] or Renae for the assets he acquired."

### 9. The debtor was insolvent or became insolvent shortly after the transfer was made.

¶53. On the insolvency factor, the chancellor found that "[Dean's] financial statements show that his monthly living expenses are almost the same as his monthly income. However, his assets and net worth have been greatly diminished as a result of the transfers of real and personal property to [Curtis]."

¶54. The chancery court then found:

> After consideration of the statutory factors set forth in Mississippi's [UFTA] along with applicable case law and the evidence presented, the Court finds that a strong presumption of fraudulent intent was established as to both [Dean] and [Curtis]. Both of these defendants conveyed assets out of the marital estate and [Dean's] personal estate to avoid the divorce Court's consideration of same for equitable distribution and alimony.

Continuing, the chancery court addressed the evidence presented by Dean and Curtis, as follows:

> In their defense the co-defendants attempted to show that Renae knew of the conveyances and separation of the parties and that she consented to same. [Dean] testified that he wanted to keep the land in the Lofton family and Renae had always agreed to that. However, the Court finds that there was not clear and convincing evidence to establish her knowledge and consent to the [subject] transactions . . . ; therefore the strong presumption of fraudulent intent on the part of [Dean] and [Curtis] was not rebutted.

The chancery court specifically found that Dean and Curtis "intended to defraud Renae of her ownership interest" in the real and personal property at issue, as well as the insurance proceeds and the Entergy payment described above.

¶55. In conclusion, we find that substantial evidence supports the chancery court's findings and ultimate determination that Dean and Curtis "intended to defraud Renae" of any interest she may have in the properties under section 15-3-107(1). The chancellor found, and the record shows, that no consideration had been paid for any of the transfers from Dean to Curtis, and Dean continued to enjoy the use and benefit of many of the properties conveyed. *See Myers*, 741 So. 2d at 278 (¶¶12-13) (affirming chancellor's finding of the existence of a fraudulent transfer where husband transferred property to his sister without consideration).

24

¶56.    With respect to Dean's retaining control over the subject properties, the chancellor in this case found particularly relevant the statement that Dean required Curtis to sign before Dean would convey the properties to him.  This statement provides, in part, that Dean could declare Curtis "unfit" and thus trigger the requirement that the properties would be transferred back to Dean and Dean's daughter, Taylor.  The supreme court found a similar scenario an indication of fraud in *Rhoads v. Borden*, 584 So. 2d 409 (Miss. 1991).  In that case, the Rhoads conveyed property to Borden, who then conveyed it to his sister.  *Id.* at 413.  The supreme court found that this "transaction [between Borden and his sister] was obviously not an arms length transaction" where Borden "offered to reconvey the property [back] to the Rhoads in the event that the court held the subject deed void."  *Id.*

¶57.    Additionally, the chancellor found, and the record reflects, a number of other "badges of fraud" attributable to the conveyances and transfer at issue here, including that the transfers were to an insider; the transfers were concealed; and the transfers were of substantially all of Dean's assets.  *See A & L Inc. v. Grantham*, 747 So. 2d 832, 843 (¶¶48-50) (Miss. 1999) (finding that a fraudulent transfer had occurred when the husband sold stock in his corporations to his sister and brother "contingent upon the outcome of, among other things, [his] divorce proceedings," and "[t]he "transfer left [the husband] possessed of little more than his personal effects, a vehicle upon which there was a sizeable lien, and his one-quarter interest in . . . [a] [b]uilding"); *Se. Bank of Broward Fla. N.A. v. I.P. Sarullo Enters. Inc.*, 555 So. 2d 704, 707-08 (Miss. 1989) (finding that a transfer of property from

25

a corporation to the corporate president's wife was fraudulent as to a judgment creditor where, among other factors, the conveyance was without adequate consideration, was made in secrecy, was in anticipation of possible future litigation, consisted of all of the corporation's property, and the corporation's president used the property as a residence for himself).

¶58. The chancellor in this case also observed that the deeds and personal property transfer-of-ownership instrument were purportedly dated February 9 (before Renae left on April 8) but were not recorded until April 27, four days after she filed for divorce. The chancellor ultimately questioned whether the transfer documents were actually signed on February 9. But even if the documents had been signed on that date, we noted in *Bank of Broward* that a three-month delay in recording a deed was deemed a badge of fraud. *Bank of Broward*, 555 So. 2d at 708 (deeming the length of delay in the corporate debtor recording the deed a badge of fraud where "[t]he deed was dated November 3, 1978 but was not recorded until February 16, 1979[, and] . . . [t]he [judgment creditor] filed suit in December, 1978"); *see also Rhoads*, 584 So. 2d at 412 (recognizing that "[t]he failure to record a conveyance, or unusual delay in recording it, ordinarily is a badge of fraud").

¶59. Dean asserts that the chancery court committed manifest error in finding a "strong presumption of fraud" rebuttable "only by clear and convincing evidence" when the court did not find that "there exists a combination of facts such as described in subsections (2)(l), (m) or (n)," as set forth in section 15-3-107(3) of the UFTA.

26

¶60. We disagree. Subsection 15-3-107(2)(m) provides:

> A transfer made . . . by a debtor may be fraudulent to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer[.]

Although the chancellor did not cite subsection 15-3-107(2)(m) in her findings or judgment, we find that she clearly made factual findings on a "combination of facts such as described in [subsection (2)(m)]," as we have addressed above. Further, as for Dean and Curtis's defense, the chancellor specifically recognized that "[i]n their defense[,] [Dean and Curtis] attempted to show that Renae knew of the conveyances and separation of the parties and that she consented to same. [Dean] testified that he wanted to keep the land in the Lofton family and Renae had always agreed to that." The chancellor found, "[h]owever, . . . that there was not clear and convincing evidence to establish [Renae's] knowledge and consent to the [subject] transactions . . . ; therefore the strong presumption of fraudulent intent on the part of [Dean] and [Curtis] was not rebutted."

¶61. Considering the detailed findings of fact made by the chancellor, and her plainly stated ruling addressing Dean and Curtis's defense, "we do not find that the absence of precise recitations or citations of applicable law was error." *Myers*, 741 So. 2d at 278 (¶13). This Court's analysis in *Myers* applies here. In that case, the chancellor found that Mr. Myers's conveyances of real and personal to his sister were fraudulent as to Mrs. Myers. *Id.* at 278 (¶¶12-13). Although the chancellor did not specifically cite the applicable law in his opinion,

27

he found that Mr. Myers's sister paid no consideration for the conveyances and that Mr. Myers continued to enjoy the use and benefit of the properties conveyed. *Id.* at (¶12). This Court affirmed the chancellor's decision, stating, "[c]onsidering these findings of fact, we do not find that the absence of precise recitations or citations of applicable law was error. Unless the chancellor has abused his discretion, we will not disturb his findings when supported by substantial evidence." *Id.* at (¶13). Likewise, in this case, we find no reversible error in the chancellor's applying a presumption of fraud here.

## II. Attorney's Fees

¶62. Dean asserts that the chancery court erred in granting Renae's request for attorney's fees in the amount of $31,917.60 because the court did not determine Renae's inability to pay such fees or whether the fees were "reasonable and necessary" pursuant to *McKee*.[11] We disagree. As addressed below, we do not find that the chancery court's assessment of attorney's fees against Dean is reversible error.

---

[11] In *McKee*, 418 So. 2d at 767, the supreme court explained that "in determining an appropriate amount of attorneys fees," a court should consider the following:

> The fee depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.

*Id.*

¶63.    First, consideration of a party's ability to pay is not required "in divorce actions where fraudulent conveyances are involved." *Myers*, 741 So. 2d at 281 (¶31) (citing *Pittman v. Pittman*, 652 So. 2d 1105, 1111 (Miss. 1995)). Although the divorce action and fraudulent-transfer action in this case were not consolidated, they are clearly related, as we have discussed above. In *Pittman*, 652 So. 2d at 1112, the supreme court recognized that in awarding attorney's fees in that case, "the chancellor obviously concluded that [the husband's] conduct in trying to convey the house to his sister and niece warranted the imposition of these fees. By his decision, the chancellor did not 'reward' [the wife], but reimbursed her the extra legal costs incurred as a result of [the husband's] actions." *Id.* Under this scenario, the supreme court held that "[t]hough [the wife] did not establish her inability to pay her attorney's fees, this Court holds that the chancellor was not manifestly wrong and that his decision to award these fees does not constitute error." *Id.* at 1112.

¶64.    We find that the same analysis used in *Pittman* applies to the comparable circumstances in this case. *See also Myers*, 741 So. 2d at 281 (¶31) (providing that because "the chancellor . . . set aside the conveyances to [Mr. Myers's sister] as fraudulent, we find that the chancellor did not abuse his discretion in awarding attorney's fees . . . to Mrs. Myers. He merely reimbursed her the extra legal costs incurred as a result of Mr. Myers's actions").

¶65.    Second, we find that Dean's assertion that the chancery court did not consider the "reasonableness" of the attorney's fees award simply ignores the record and the chancery court's final judgment. The chancellor did consider the reasonableness and necessity of the

attorney's fees. Renae submitted a "*McKee* affidavit" at trial, and it was admitted into evidence. The affidavit delineated the fees incurred by her attorney, her attorney's experience, the reasonableness of his hourly fees, his certification that he had primary responsibility for the case, and his preclusion from representing other persons during the pendency of the lawsuit. Attached to the affidavit were a detailed itemization and description of the time he spent on the case. The chancery court considered this affidavit in rendering its final judgment and, in particular, in rendering its decision to grant Renae's request for attorney's fees. "A chancellor may award attorney's fees 'based on the information already before it and the court's own opinion based on experience and observation.'" *Savell v. Manning*, 325 So. 3d 1208, 1223 (¶54) (Miss. Ct. App. 2021) (quoting Miss. Code Ann. § 9-1-41 (Rev. 2014)). The chancellor did so in this case. Accordingly, we find that Dean's assignment of error regarding attorney's fees is without merit.

¶66. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**